[Civ. No. 26915. Fourth Dist., Div. One. Aug. 23, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
CASA BLANCA CONVALESCENT HOMES, INC., Defendant and
Appellant.

512

**COUNSEL**

Weissburg & Aronson, Peter Aronson, Jay N. Hartz and James R. Kalyvas for Defendant and Appellant.

Edwin L. Miller, Jr., District Attorney, and William D. Holman, Deputy District Attorney, for Plaintiff and Respondent.

**OPINION**

**STANIFORTH, J.**—The People by this action sought civil penalties and injunctive relief (Bus. & Prof. Code, §§ 17200, 17536)[1] against defendant Casa Blanca Convalescent Homes, Inc. (Casa Blanca). The People charged Casa Blanca with multiple unlawful and unfair acts, ranging from failure to provide adequate nursing care so as to prevent decubitus ulcers (bedsores) to failure to serve adequate diets and keep the nursing facilities free from flies and pests, etc. After a court trial the judge imposed judgment upon Casa Blanca for $167,500 in penalties[2] and appropriate injunctive relief.

In its memorandum of intended ruling, the trial court described each type of act found to be a violation and listed exactly how many of each type of act or condition it found in Casa Blanca's facilities.

---

[1] At the time this action was commenced the relevant provisions regarding unfair competition were contained in Civil Code sections 3369 through 3370.1. Section 3369 was amended in 1977. (Stats. 1977 ch. 299, § 2, pp. 1203-1204.) Subdivisions 2 through 5 of Civil Code section 3369 are now contained in Business and Professions Code sections 17200, 17201, 17203 and 17204. References in this opinion are to the current Business and Professions Code sections.

[2] The penalties were assessed only for one year of violations occurring between September 20, 1976, and September 20, 1977.

## FACTS[3]

Casa Blanca Convalescent Homes, Inc., is a State of California licensed operator of nine nursing homes in San Diego County. Each of these facilities has been licensed and is responsible under the law for compliance with provisions of long term care under the Health, Safety, and Security Act of 1973 (Health & Saf. Code, § 1417 et seq.) and the regulations contained in titles 17 and 22 of the California Administrative Code.

Since 1974 Casa Blanca in its nine nursing facilities has on numerous occasions (by its actual admissions) allowed or caused incidents to occur and conditions to exist which violated nursing home regulations established by the State of California. The following is a partial listing of some of the acts and/or conditions found to exist in the Casa Blanca facilities:

### PATIENT LEOLA DOBBS

Dobbs was a neurologically deprived patient discharged from Tri-City Hospital on July 16, 1976, and on that day was admitted to Casa Blanca facility Hilltop Convalescent Center (Hilltop). She was particularly susceptible to bedsores. On September 13, 1976, Dobbs returned to Tri-City Hospital. Her condition had deteriorated; she was stuperous, unresponsive, semicomatose with huge bedsores on her hips. In addition, she had constrictures and was dehydrated to the point where she lay in a fetal position. These facts warranted the conclusion she received poor nursing care while at Hilltop. Careful nursing care would have prevented her constrictures, bedsores and dehydration.

Dobbs' Casa Blanca medical record revealed, while she had an in-dwelling catheter, there were at least 70 instances where no record was kept of her intake and output of fluids. Such records are required by title 22, California Administrative Code section 72315, subdivision (j)(2). The purpose for maintaining a record of a patient's intake and output is to aid in the prevention of dehydration.

Dobbs was also prone to decubitus ulcers, yet her medical records indicate the turning schedule, an aid in the prevention of bedsores, maintained for her was inadequate. The nurse's aide's notes in some instances note "turned q 2 hrs." This record fails to tell how and when Dobbs was turned. A patient on a turning schedule, such as Dobbs, should be turned every two hours. Dobbs' medical record demonstrates the deficiencies (by shifts).

---

[3]On this appeal we review the evidence conformable to the long-standing and familiar substantial evidence rules as set forth in *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].

7 a.m. to 3 p.m.: 9 instances without document of turning at all.

25 instances of "q 2 hrs."

18 instances of the patient being turned but no entry noting the position.

3 p.m. to 11 p.m.: 5 instances of no turning documentation at all.

6 instances of "q 2 hrs."

31 instances of turning without reference to position with intervals of greater than 2 hours.

11 p.m. to 7 a.m.: 7 instances of no documentation.

30 instances of "q 2 hrs."

17 instances where the interval was greater than 2 hours.

When Dobbs was retransferred to Tri-City Hospital from Hilltop, she was accompanied by an interfacility transfer sheet which became part of the Tri-City Hospital medical record. The purpose of the transfer sheet was to communicate information about the patient to the receiving facility and provide for a continuity of treatment.

The sheet was filled out by the director of nurses at Hilltop. The description of Dobbs' condition on the transfer sheet was inaccurate. When Department of Health representatives later went to Hilltop to investigate the treatment of Dobbs, they examined her medical record and found a copy of the interfacility transfer sheet sent to Tri-City Hospital was missing. They asked the administrator or director of nurses where the copy of the interfacility transfer sheet was and were told that they would have to look for it. Following a two-hour search for the copy of the interfacility transfer sheet, one was produced. *The sheet produced was not a copy of the one sent with Dobbs but was prepared at another time.*

### Patient Olive Blaha

The medical record of patient Olive Blaha contains a physician's order indicating she is prone to decubitus ulcers. The record contained no turning sheet.

### PATIENT GRACE HAWLEY

Grace Hawley's medical chart has an entry indicating the presence of a decubitus ulcer (July 23, 1976). No turning record was kept until August 8, 1976. Many of the entries in the record are internally contradictory. For example, the turning sheet reports on August 10, 1976, the patient was in bed on her right side between 10 a.m. and 12 p.m. The nurse's notes for the same period indicate Hawley was in a wheelchair during that time. The same contradiction is true of the entries on August 13, 1976.

### PATIENT MARIE JOHNSON

The medical records of Marie Johnson report she is prone to decubitus ulcers. The records contain over 10 entries on the turnsheets beginning June 4, 1977, which indicate the patient was turned to the same side as the record says she had been turned two hours earlier. These entries on the turnsheets are generally found in the last line of a column on one page and at the top of the next page. The fact that these entries appear at the bottom of one page and continue on the top of the next page suggests the records were not filled out in chronological order, from top-to-bottom, as the patient was turned. Rather, they were completed later.

### PATIENT BLANCHE HOLMES

Blanche Holmes' medical records contain a physician's order on December 8, 1977, to record her vital signs every four hours until they were normal. The patient's blood pressure was not recorded as ordered on 17 different occasions between December 8, 1977, and December 14, 1977.

### PATIENT RUTH ANNE DAVIS

The patient record of Ruth Anne Davis contains no record of a measurement of her fluid intake and output between September 22, 1977, and December 10, 1977, despite the fact Davis had a Foley catheter inserted during that entire period.

### PATIENT CHARLES FRANKENBERG

Charles Frankenberg was a patient at Hilltop from September 20, 1976, through December 10, 1976. His medical chart indicated he was prone to decubitus ulcers. A review of his record revealed he was in his wheelchair almost daily. The same chart also contained a number of entries which read for the same time period, "turned every 2 hours or turned x4."

## PATIENT HARRIET CORBIN

On December 31, 1976, Harriet Corbin's physician ordered her blood pressure be taken twice a day. Her medical record indicates the facility failed to take her blood pressure as directed on at least 260 separate occasions between January 1, 1977, and June 30, 1977.

## PATIENT GLADYS VOLCK

In July 1976 Gladys Volck was admitted to Hilltop. On August 20, 1976, a friend of Volck's found her in a stuporous condition tied up in a wheelchair, sitting in a pool of urine. Her tongue was hanging out of her mouth, her arms and legs were swollen and there were blisters on both heels "the size of baseballs." The friend ran out and called an ambulance to take Volck to an acute care facility. There she was treated by Dr. Stein who said her swelling had progressed to the point where it would have been obvious for several days. For this period, Casa Blanca's medical records regarding Volck contain no mention of her deteriorated condition.

Following Volck's transfer to the acute care hospital, Mr. McClaren, a field representative from the Social Security Administration, conducted an investigation into the quality of treatment Volck received at Hilltop. As part of this investigation, he interviewed Dr. Raymond Dann, the physician responsible for Volck's care while she was a patient at Hilltop. Mr. McClaren then told the Casa Blanca representative about his interview with Dr. Dann.

The director of nursing contacted Dr. Dann and asked him to write a letter, indicating the treatment given Volck by Casa Blanca was adequate. The first letter written by Dr. Dann possibly was not strong (self-serving) enough. In the fourth attempt to exculpate itself from any wrongdoing, the director of nursing prepared a letter using Dr. Dann's stationery. A handwritten rough draft of the letter was found in Volck's medical record at Hilltop.

Ms. Homewood, a questioned documents examiner from the San Diego Police Department, examined Volck's records. The examination of the medical chart revealed many of the entries regarding her diet had been filled out by one person, Casa Blanca's director of nursing, rather than the shift personnel who supposedly cared for Volck.

## CREATION OF RECORDS AFTER THE FACT

Hilltop at one time employed an individual whose job it was to fill in blank spaces on a patient's medical record without regard for accuracy. One

of her duties entailed altering her style of writing so the medical record would appear as if different individuals had recorded treatment as it was administered to a particular patient. Another of her duties entailed taking patients' charts to a doctor's office so he could complete them without having to see the patients.

Such violations were not confined to Casa Blanca's Hilltop facility. A review of the record of Helen Nednien, a patient at Casa Blanca's Hillcrest facility (Hillcrest), reveals while her turnsheet was indeed filled out, there were 47 instances when she was listed as being on her right side at 5:30 a.m. and "being turned onto her very same side at 7:30 a.m." On one occasion, a Department of Health Services (DOHS) inspector examined the record and found no record had been kept of the turning of Nednien at 7:30 a.m. and 9:30 a.m. The inspector left the record for a while only to return later and find someone had filled it in during her absence.

## FILTH

Shortly before she left Casa Blanca's employ in March 1976, Patricia Ellis, a licensed vocational nurse, examined one of the patients and found there were maggots present in her vagina and anus. Ellis reported this fact to her superiors. Despite this report, there was no evidence anything was done to correct the situation or prevent its recurrence.

Several months later, at the same facility, cockroaches were found in patients' beds and on one patient's colostomy bag. Other facilities were found to have cockroaches at the nurse's station and in the patients' beds.

Many of Casa Blanca's patients were incontinent and required frequent linen changes. Failure to provide clean linen for these patients was a common occurrence.

## INADEQUATE NURSING STAFF

Casa Blanca admitted to at least five instances of inadequate nursing staff. In addition, there were instances when Casa Blanca (again by its own admission) did not have sufficient numbers of people working on its nursing staff to provide the required bowel and bladder training program for incontinent patients.

Instead of adding additional personnel to its staff, Casa Blanca determined those patients whose needs in this regard could not be attended to were found unsuitable for bowel and bladder retraining. There were instances when the number of nurse's aids maintained could handle the needs of only

four or five incontinent patients when as many as thirty such patients had been admitted to its facility.

## UNAUTHORIZED USE OF RESTRAINTS

On several occasions Casa Blanca was using body restraints without the necessary physician's order. One graphic example is the case of patient Jose Andrade. His leg was tied to the rail on his bed. As a result, Andrade's leg was broken. He was then transferred from the Casa Blanca facility to an acute care hospital. In addition, there was at least one occasion when Casa Blanca's staff locked DOHS inspectors out of its facility in an attempt to conceal its use of restraints without proper medical authorization.

## THE BURNING OF KAREN GENTLES

Before the burning of Karen Gentles, Casa Blanca had been warned its hot water was too hot on three separate occasions. Despite these warnings, this young psychiatric patient was scalded while bathing and received severe burns at Casa Blanca's Genesee East facility. The water temperature at Genesee East was found to be too hot *after* the complaint was filed in this action.

## MOLDY FOOD

Casa Blanca employed a dietary consultant rather than a full-time dietician. The number of hours the consultant would donate to the dietary needs of each facility was found inadequate. The evidence at trial established if Casa Blanca needed to add trained personnel anywhere other than the nursing department, it was in the kitchen. On two occasions, Casa Blanca representatives directed old food be kept; liver, which had turned green with mold, was kept so it could be pureed and later served to patients instead of being thrown out. Maggot-infested carrots were saved and fed to the patients. Casa Blanca issued a memorandum, "Let's Eliminate Waste," to its facility administrators encouraging them to cut down on food costs and encouraging improvisations to save money.

## THE INSPECTOR'S REPORTS—"STATEMENT OF DEFICIENCIES"

Inspectors from the DOHS visited Casa Blanca's facilities on numerous occasions. Following its inspections, it presented Casa Blanca with its findings in a "Statement of Deficiencies." A representative of Casa Blanca then reviewed the deficiencies and provided the DOHS with a "Plan of Correction." In those instances where Casa Blanca's representatives disagreed with the statement of deficiencies, they would express their disagreement in

writing on the document or simply refuse to sign it. Many of the inspection reports contained admissions of the allegations in the statement of deficiencies and plan of correction. These were admitted into evidence.[4]

## FINANCIAL ABILITY OF CASA BLANCA TO RESPOND TO CIVIL PENALTIES

After paying all of its expenses in 1980, Casa Blanca realized a net profit of $1,376,205. Counsel for Casa Blanca agreed Casa Blanca could easily respond to civil penalties of $250,000.

## DEFENSE EVIDENCE

Casa Blanca presented evidence disputing the violations, together with evidence from the DOHS personnel, it was impossible to make continuous total compliance with each of the title 22 (Cal. Admin. Code) regulations. There was testimony that none of the DOHS inspectors ever inspected a skilled nursing facility in any part of the State of California that was not at varying levels of violation of the regulatory framework. The violations averaged between 25 to 50 per inspection. The average number of violations in San Diego County was between 25 to 40 per inspection. Casa Blanca's violations were numerically significantly below that average.

It was further contended it was not possible to be free from violating the regulations because of the subjective nature of the regulations themselves and the manner in which they are interpreted by the DOHS inspectors.

Finally, it was urged there was an error rate in the charting or administration of medications in skilled nursing facilities ranging from a 10 to 25 percent variance; it was beyond the control of any facility to obtain a higher or more perfect standard of compliance with such regulations.

## STATEMENT OF DECISION

After hearing the evidence, the trial court issued its memorandum of intended ruling, finding Casa Blanca had "repeatedly failed" to file or have on file an adequate surety bond (covering patient deposits) required by title

---

[4]Following entry of judgment by the trial court in this case, Casa Blanca, through its trade association, the California Association of Health Facilities, also represented by Weissburg and Aronson, opposed the passage of Assembly Bill No. 1536 (1981). Subsequently, an amendment to the bill was introduced, nearly six months after judgment, making the statement of deficiencies and the plan of correction inadmissible in this type of proceeding. Following the introduction of that amendment, Casa Blanca's lawyers and its trade association withdrew their opposition to the bill's passage. Once the trade association withdrew its opposition to the amendment, the bill passed and became effective January 1, 1983, over two years after the last witness was excused in this case. (Health & Saf. Code, § 1280.)

17 of the California Administrative Code section 253.1 and title 22 of the California Administrative Code section 72241. The evidence showed there were 364 days when various Casa Blanca facilities had patient deposits in excess of the bond posted. The trial court aggregated the violations by each facility and found five acts for which a fine was imposed. For example, Madison had 190 days (69 percent of the time) over bond but was treated as one violation; Hilltop committed 17 violations which were aggregated into one act for which a $2,500 fine was imposed.

The court found 19 "acts" of repeated failure to maintain proper health records. These 19 "acts" were the result of aggregating over 1,000 record keeping violations within one year. Each patient's medical records entered in evidence contained numerous violations. Each record was counted as *one* act in violation of the California Administrative Code for which a $2,500 fine was levied.

In similar fashion, in response to its 10 specific findings of ultimate fact for repeated violations of various described specific "acts" or conditions, the court found a total of 67 "acts" and assessed a $2,500 fine for each act for a total penalty of $167,500. The court then declared defendants "will be enjoined from allowing any of the following acts or conditions to exist in any of [its institutions]." The court then specified in detail the "acts" and conditions to be enjoined.

At the request of Casa Blanca, the court issued its statement of decision, adopting in exact detail its memorandum of intended ruling. Casa Blanca filed lengthy objections to this statement of decision. The court thereafter entered judgment imposing a fine of $167,500, plus costs and an injunction conformable to the statement of decision. Casa Blanca appeals.

DISCUSSION

I

■ Casa Blanca contends the trial court failed to provide a sufficient statement of decision, explaining the factual and legal basis for its determination on the principle issues as required by Code of Civil Procedure section 632. Section 632 provides: "In superior, municipal, and justice courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. Upon the request of any party appearing at the trial, made within 10 days after the court announces a tentative decision, or if the trial has lasted less than one day, made prior to submission of the matter for decision, the court shall issue a statement of decision explaining the factual and legal basis for its decision as to each

of the principal controverted issues at trial. The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision. After a party has requested such a statement, any party may make proposals to the content of the statement of decision.

"The statement of decision shall be in writing, unless the parties appearing at trial agree otherwise; however, when the trial has been completed within one day, the statement of decision may be made orally on the record in the presence of the parties."

■ A trial court in rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts. (*Division of Labor Law Enforcement* v. *Transpacific Transportation Co.* (1977) 69 Cal.App.3d 268, 274 [137 Cal.Rptr. 855].) ■ The trial court in its statement of decision declared Casa Blanca had committed 67 specified "acts" in violation of nursing home regulations constituting unlawful and unfair business practices. The court specifically described 10 different categories of "acts" which occurred in Casa Blanca facilities on "repeated" occasions.

Furthermore, in its statement of decision the trial court listed exactly how many "acts" it found to have occurred within each of the categories described. The statement of decision fairly and completely sets forth the factual and legal basis for the court decision as required by Code of Civil Procedure section 632. It lists all the ultimate facts necessary to decide the issues placed in controversy by the pleadings.

Casa Blanca would require more. Casa Blanca would compel the trial court to make findings with regard to detailed evidentiary facts, to make minute findings as to individual items of evidence. Such a detailed evidentiary analysis is not required by law. (*Richmond* v. *Dofflemyer* (1980) 105 Cal.App.3d 745, 764 [164 Cal.Rptr. 727].) ■ Only where a trial court fails to make findings as to a material issue which would fairly disclose the determination by the trial court would reversible error result. (*Employers Casualty Co.* v. *Northwestern Nat. Ins. Group* (1980) 109 Cal.App.3d 462, 474 [167 Cal.Rptr. 296].) Even though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission to make such finding is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings. (*McAdams* v. *McElroy* (1976) 62 Cal.App.3d 985 [133 Cal.Rptr. 637].) A failure to find on an immaterial issue is not error. (*Colombo Construction Co.* v. *Panama Union School Dist.* (1982) 136 Cal.App.3d 868 [186 Cal.Rptr. 463].) ■ The

trial court's statement of decision discussed and disposed of all material issues raised at trial. It fairly discloses the court's determination of all issues of fact. (*Sharove* v. *Middleman* (1956) 146 Cal.App.2d 199, 202 [303 P.2d 900].)

Code of Civil Procedure section 632 authorizes the party to request a statement of decision and thereby obtain the legal and factual basis for the trial court's decision. The parties may specify which principal controversies it wishes the court to address. Absent such a request there is no need for the court to render a statement of decision. Casa Blanca made a series of special inquiries concerning the court's determination of violations of California Administrative Code, title 22.

In the request for statement of decision filed by Casa Blanca, rather than a request for the legal/factual basis for the court's decision on the issues framed by the pleading, it made 16 demands, each with several subparts.[5] These subparts would require the trial court to answer over 75 questions and make a list of findings on evidentiary facts on issues not controverted by the pleadings. Such a requirement cannot be made of the court. (See *Division of Labor Law Enforcement* v. *Transpacific Transportation Co.,* *supra,* 69 Cal.App.3d 268.) Casa Blanca seeks an inquisition, a rehearing of the evidence. The trial court was not required to provide specific answers so long as the findings in the statement of decision fairly disclose the court's determination of all material issues. (*Security Pacific Nat. Bank* v. *Chess* (1976) 58 Cal.App.3d 555, 566-569 [129 Cal.Rptr. 852].)

In *McAdams* v. *McElroy, supra,* 62 Cal.App.3d 985, it was said: " 'The established practice presupposes that counsel desiring such special findings will draft and propose them in the usual form [citation]. The action of the court in approving or disapproving them will constitute the ruling. Appellants here sought to conduct a general inquisition and neither drafted nor submitted any proposals for such consideration.' " (*Id.,* at p. 993.)

---

[5]These are examples of the questions posed:

"(a) Did the court intend each violation of a Department of Health regulation constituted an unlawful and unfair business practice within the meaning of Business and Professions Code 17200 (formerly Civil Code § 3369)?

"(b) If the answer to subparagraph (a) is in the negative, did the court intend that only repetitive violations of Department of Health regulations constituted unlawful and unfair business practices within the aforementioned statute?

"(c) If only repetitive violations were intended by the court to constitute such violations, is one repeat of a violation, whether or not at the same facility and whether or not under the same or similar circumstances intended by the court to constitute an unlawful and unfair business practice within the aforementioned statute?

"What is intended by the foregoing series of requests is that the court set forth definitively the legal basis for its determination that a violation of the statute has occurred by defining what the court means by a violation."

The court went on to say submission of a request without resolution is improper because: "That practice unfairly burdens the trial judge in that he must not only speculate which questions embrace ultimate as distinguished from evidentiary facts, but also search his recollection of the record without the assistance of a suggestion from counsel. Particularly if there is evidence which would give a multiple choice in answering the interrogatory, the court should have guidance from the requesting party." (*McAdams* v. *McElroy, supra,* 62 Cal.App.3d 985, 993.)

Casa Blanca's request of the trial court to answer these questions constituted an inappropriate challenge to the findings or the statement of decision. The court's statement of decision specifically found 67 violations of 10 different nursing home regulations. The trial court did not find each separate violation to constitute an "act." More than a thousand record keeping violations were determined to be 17 "acts"—based upon 17 separate sets of patient records. The evidence detailed 12 different occurrences when Casa Blanca personnel administered medicine or treatment without first obtaining a doctor's order. The evidence showed two broad classes of violations: (1) failure to render treatment, or (2) giving treatment without order. The court described the violations and aggregated these violations into two "acts." The court was not required to give the evidentiary detail supporting its ultimate finding of fact. The trial court performed its statutory duty. There is no error here.

## II

Casa Blanca demanded the court define in its statement of decision what was meant by a "business practice." In so doing, it called upon the trial court to answer questions already settled as a matter of law. For example, in *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817], the business of defendant was collecting debts. The filing of litigation was a principal part of its business activity and thus was held a business practice. The Supreme Court held repeated violations of statute by acts which constituted a principal part of its business constituted an unlawful business practice and, as such, was actionable under Civil Code section 3369 (now Bus. & Prof. Code, § 17200 et seq.).

The facts, admitted in the pleadings, were that Casa Blanca was in the business of operating and managing patient care hospitals and the sale of nursing home services. Nursing care was its primary business activity. This admission established, without question, the series of acts complained of was a business activity or practice. The key question presented to the trial court was not whether this was a "business practice or activity" but rather whether this particular business activity was unlawfully conducted. The trial

court, based upon more than sufficient evidence, found Casa Blanca was engaged in a variety of unlawful practices in its primary business—rendering nursing care.

We conclude there is both a factual and legal basis for finding not only were there violations of the administrative regulations in question, but its activities constituted a pattern of behavior pursued by Casa Blanca as a "business practice."

### III

Casa Blanca next complains of the trial court's failure to make specific findings regarding its fifth affirmative defense, its contention of unconstitutionality of Business and Professions Code section 17200 by reason of "impossibility of compliance" with the statute. The decision of the court impliedly rejected this constitutional argument. It is true, there was no factual or legal basis articulated for that rejection. ■ The failure to make a finding on an issue raised in the pleadings is harmless error when the missing finding reasonably may be found to be implicit in other findings. (*McAdams* v. *McElroy, supra,* 62 Cal.App.3d 985, 996.)

The trial court's decision the proceedings by the DOHS were in violation of due process and therefore unconstitutional was a complete bar to any findings of guilt. After receiving evidence from Casa Blanca witnesses concerning claimed impossibility of compliance with various provisions of title 22 of the California Administrative Code, the trial court necessarily found to the contrary. More than sufficient evidence supports the trial court's implied finding Casa Blanca had the ability to comply with the regulations. There is no factual basis to warrant a contrary finding of "impossibility of compliance."

■ Casa Blanca offers a second basis for its constitutional argument of impossibility of compliance with the regulations. This argument is based upon its claim of industry-wide noncompliance with the regulations.

The fact Casa Blanca is subject to a comprehensive scheme of regulation does not ipso facto support a claim of unconstitutionality. That other nursing homes also violate the regulations is no lawful excuse or evidence of unconstitutionality. Wrongdoing is not excused merely because others engaged in it. Courts have long upheld prosecutorial discretion to select a defendant from a number of wrongdoers. (See *People* v. *Superior Court* (*Lyons Buick-Opel-GMC, Inc.*) 70 Cal.App.3d 341 [138 Cal.Rptr. 791].) Whether competitors employ the same or similar methods in their business practices is immaterial to the charge made against Casa Blanca concerning those meth-

ods. If such is the case, then such competitors should likewise be prosecuted. It is not a reason why Casa Blanca should escape responsibility. (See *International Art Co.* v. *Federal Trade Commission* (7th Cir. 1940) 109 F.2d 393, 397.)

In *Bondanza* v. *Peninsula Hospital & Medical Center* (1979) 23 Cal.3d 260 [152 Cal.Rptr. 446, 590 P.2d 22], the Supreme Court focused on the overreaching nature of defendant's actions, the oppression which might result from defendant's action and the public policy violated by defendant's wrongdoings. A court cannot excuse unfair acts with a claim that business considerations of industry-wide practice justify such conduct. (*International Art Co.* v. *Federal Trade Commission, supra,* 109 F.2d 393, 397; *Hobby Industry Assn. of America, Inc.* v. *Younger* (1980) 101 Cal.App.3d 358, 372 [161 Cal.Rptr. 601].)

The trial court looked carefully at Casa Blanca's activities. The court found it was engaged in a pattern of conduct consisting of repeated violations of the regulations governing conduct of nursing homes. No evidence was presented showing a similar pattern of violations existing at any other facility other than those operated by Casa Blanca. ■ All presumptions and intendments favor the validity of a civil statute unless its unconstitutionality appears clear, positive and unmistakable. (*People* v. *Mel Mack Co.* (1975) 53 Cal.App.3d 621, 629 [126 Cal.Rptr. 505].) No such showing is made here.

The regulation of the health care industry is not an unreasonable use of police power. These regulations are specifically designed to insure those individuals confined to Casa Blanca facilities receive adequate care and treatment. The failure of Casa Blanca to adhere to minimum standards of health care poses a real danger to the public health and safety of this community. (See *People* v. *Balmer* (1961) 196 Cal.App.2d Supp. 874, 877 [17 Cal.Rptr. 612].) The California Supreme Court in *People* v. *McKale* (1979) 25 Cal.3d 626 [159 Cal.Rptr. 811, 602 P.2d 731], held administrative regulations promulgated under the provisions of Business and Professions Code section 17200 are both lawful and enforceable. We find no grounds here to declare the code section or the regulations unconstitutional.

## IV

■ Casa Blanca next contends titles 17 and 22 of the California Administrative Code are unconstitutionally vague and ambiguous, subject to varying interpretations. The trial court found the sections unambiguous and enforced them by imposing sanctions based upon clear and strong evidence indicating breach of the regulations. Casa Blanca claims the regulation re-

quiring the nursing facilities to be "clean and sanitary" is vague and ambiguous. In *People* v. *Balmer, supra,* 196 Cal.App.2d Supp. 874, a nursing home made a similar argument. The appeal court said: "The words clean, sanitary and good repair are not so vague and indefinite as to make Administrative Code sections unconstitutional." (*Id.,* at p. 879.)

These terms are not too vague to be understood by a jury, a trial court and these parties. Where the facility was so filthy and pest ridden that maggots were observed in patients' body cavities, can there be any doubt as to the meaning of the regulation or its breach?

■ Casa Blanca also asserts 19 violations of the medical records regulations (Cal. Admin. Code, tit. 22, § 72547) resulted from its inability to understand them, due to their complexity and length. The violations of record requirements did not involve some vague, technical matters. There is no vagueness in a requirement to keep records of fluid intake, blood pressure, body temperature, number, time and nature of turning the body of a bedridden patient. There was a pattern of unlawful neglect in record-keeping. Numerous patients' records in various facilities were not only not maintained, but were also fabricated, forged in an effort to conceal evidence of poor nursing care.

■ Casa Blanca also challenges the regulation requiring adequate staffing. The language of the regulation clearly states: "Nursing service personnel shall be employed and on duty in at least the number and with the qualifications determined by the Department to provide the necessary nursing services for those patients admitted for care. . . ." (Cal. Admin. Code, tit. 22, § 72329, subd. (a).) Casa Blanca claims as a provider of skilled nursing services it was excused from providing any specific number until told to do so by the DOHS. Such a fallacious view, if accepted, would result in Casa Blanca being *under no obligation to see that its facilities were adequately staffed to care for helpless bedridden patients.*

The regulation plainly requires such numbers of skilled nursing personnel to "provide the necessary nursing services" for whatever number of patients are in house. While no specific number is preset by a rule, the formula is plain and clear. Casa Blanca must have as many skilled nursing personnel as are needed to "provide the necessary nursing services." Casa Blanca patently, grieviously violated this rule. The staffing of a facility with only enough skilled personnel to provide bowel and bladder training for four or five of thirty incontinent patients constitutes a blatant failure to adequately staff a nursing home by anyone's definition. The evidence before the trial court clearly establishes multiple failures to provide an adequate number of nurses and training of nursing personnel to meet patient needs.

## V

■ The charge of lack of adequate staff made against Casa Blanca is based not only upon there being *unlawful* acts but *unfair* acts as well.

In *Bondanza* v. *Peninsula Hospital & Medical Center, supra,* 23 Cal.3d 260, 266-267, the Supreme Court without attempt at definition found a business practice (collection procedure) unfair within the meaning of Business and Professions Code section 17200 and at the same time disapproved its unlawful character—a "patent violation of the code." Thus a business procedure may be both unfair and unlawful.

No California court has yet defined in this setting the parameters of the term "unfair business practice." There are, however, guidelines set by the Federal Trade Commission and sanctioned by the United States Supreme Court in *F. T. C.* v. *Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244 [31 L.Ed.2d 170, 179, 92 S.Ct. 898], which offer needed guidance. The United States Supreme Court said: "The Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair: '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).'" (*Ibid.,* fn. 5.)

We conclude an "unfair" business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. (See also *Spiegel, Inc.* v. *F. T. C.* (7th Cir. 1976) 540 F.2d 287, 298.) Casa Blanca's practice of providing insufficient nursing personnel was not only an illegal practice but also an unfair business practice in violation of Business and Professions Code section 17200.

## VI

■ Casa Blanca next argues *substantial compliance* with titles 17 and 22 of the California Administrative Code regulations as a defense to the charges made. Nothing in the rules or statutes before this court indicate substantial compliance is a defense against a civil action or a criminal prosecution under Health and Safety Code section 1290. The term "substantial compliance" has no application in such legal proceedings. The operator of

a skilled nursing facility is required to comply with all provisions of the code absent an exemption granted by the DOHS.

The concept of substantial compliance (found in the license renewal statute) relied upon by Casa Blanca has no application here. Such concept is relevant when used in conjunction with license renewals. It does not import a different standard of conduct which will be tolerated to avoid civil or criminal penalties. Finally, the provision for substantial compliance in license renewal matters was not promulgated until almost two years after the trial here was concluded (Feb. 20, 1982).

## VII

Casa Blanca contends equitable estoppel should have been raised by the trial court to preclude enforcement of the regulations in issue here. There are several defects in this argument. First, Casa Blanca failed to raise this issue in the trial court. It is precluded from raising it for the first time on appeal. Second, the existence of estoppel is a question of fact for the trial court. A trial court's determination is conclusive on appeal if supported by substantial evidence. (*Killian* v. *City and County of San Francisco* (1978) 77 Cal.App.3d 1, 14 [143 Cal.Rptr. 430].) Casa Blanca did not contend below or even hint it had been led astray in some fashion by the DOHS.

The doctrine of equitable estoppel if properly raised applies to a situation where the party seeking to invoke the doctrine was led to believe in the truth of a particular set of facts, in fact believed them to be true and had a right based upon past conduct to believe in them. (*Killian, supra,* 77 Cal.App.3d at p. 13.) There is no evidence here the DOHS led or misled Casa Blanca to believe it was acquiescent in Casa Blanca's conduct. The evidence is of deficiency notices sent regularly to the Casa Blanca facilities. Time and again Casa Blanca promised to embark upon a plan of correction only to have the same deficiency appear in another facility or in the same facility on a later occasion.

Furthermore, the DOHS has no authority to bind the district attorney or to restrain it in the enforcement of law. The enforcement of administrative regulations and the civil proceedings to compel the cessation of unlawful or unfair business practices are two separate legal processes involving two separate, distinct law enforcement agencies. The commencement of an administrative action by the DOHS does not restrain the authority delegated by law to the district attorney. One branch of government may not prevent another from performing official acts required by law. (*People ex rel. Younger* v. *F. E. Crites, Inc.* (1975) 51 Cal.App.3d 961 [124

Cal.Rptr. 664]; *People* v. *Hy-Lond Enterprises, Inc.* (1979) 93 Cal.App.3d 734 [155 Cal.Rptr. 880].)

■ Finally, the collateral estoppel doctrine should not be applied here as a matter of public policy and sound reason. If applied it would authorize Casa Blanca to continue to violate provisions of the California Administrative Code with the knowledge or belief its previous unlawful/unfair conduct would protect it from a lawsuit for further unlawful or unfair practices. Applying such a rule would protect Casa Blanca from any sanctions on the theory that some tolerance of its conduct immunizes it in all respects. The doctrine should not be applied in this setting.

The doctrine of collateral equitable estoppel will not be applied against a governmental entity where there is a sound public policy against applying the doctrine. It was said in *Chern* v. *Bank of America* (1976) 15 Cal.3d 866 [127 Cal.Rptr. 110, 544 P.2d 1310] "Given the quality and intensity of the public interest involved, a reexamination of the legal significance of recurring factual events in which the same plaintiff is involved should not be foreclosed under collateral estoppel principles." (*Id.,* at p. 873.)

The present case concerns a matter of great public interest involving care for the elderly in our society. It would be outrageous to say the public has no concern in the enforcement of these rules or that the district attorney could be collaterally estopped, for example, by DOHS' action in renewing Casa Blanca's license.

Federal case law has long prohibited use of the doctrine of equitable estoppel in cases involving public interest where a government has simply failed to take appropriate action in the past. (*P. Lorillard Co.* v. *Federal Trade Commission* (4th Cir. 1950) 186 F.2d 52.) California case law also declares lax law enforcement in the past is not a ground for limiting enforcement of the law in a present case. (See *In re Finn* (1960) 54 Cal.2d 807, 812 [8 Cal.Rptr. 741, 356 P.2d 685].)

Finally, the remedies of the district attorney and the DOHS are separate and cumulative to each other. (*Killian* v. *City and County of San Francisco, supra,* 77 Cal.App.3d 1.) The sweeping language of Health and Safety Code sections 1430 and 1433 show a legislative intent to authorize the district attorney to bring a cause of action and seek remedies in whatever form such remedies might exist. The use of the term "any other remedy at law" (§ 1430) and "[t]he remedies provided by this chapter are cumulative" (§ 1433), allow but one construction. The doctrine of collateral estoppel has no application here.

## VIII

Casa Blanca next contends the trial court erroneously admitted the DOHS inspection reports into evidence. This contention is unsound. Those reports constituted an admission by a party. They were admissible pursuant to Evidence Code sections 1220 through 1222. The trial court made such a finding and admitted the documents into evidence. The documents were prepared by, and contained entries by, both representatives of the DOHS and Casa Blanca. They were made after the inspection of one or more of the facilities.

In some instances Casa Blanca representatives claimed to have been compelled to sign these documents; however substantial evidence supports the trial court's finding Casa Blanca's review and acceptance of the information on the left-hand side of the documents was not compelled but was in fact an admission regarding its conduct. The fact the statements were required by law to be made does not prevent their admission under Evidence Code sections 1220 and 1221 so long as the declarant is a party to the action. *Mar Shee* v. *Maryland Assurance Corp.* (1922) 190 Cal. 1 [210 P. 269], and *Bebbington* v. *Cal. Western etc. Ins. Co.* (1947) 30 Cal.2d 157 [180 Cal.Rptr. 673, 1 A.L.R.2d 361], cited by Casa Blanca, both involved fact situations where the person who uttered the statement was not a party to the action and therefore it is not admissible. In *Kauffman* v. *Meyberg* (1943) 59 Cal.App.2d 730 [140 P.2d 210], it was held the statements on the inspection reports were admissible (not made inadmissible) the fact they were required to be filled out.

Since the 1982 amendment to the Health and Safety Code (Assem. Bill No. 1536, as amended June 25, 1982) the admission of statements of deficiencies as evidence was prohibited in an action such as the case at bench. This is a change in the law of evidence from that previously set forth in Evidence Code sections 1220 to 1227. Evidence Code section 12, subdivision (b)(1), declares where an appeal is taken, the reviewing court applies the rules of evidence governing at the commencement of the trial. (Witkin, Cal. Evidence (2d ed. 1966) § 8, p. 11.) The trial here commenced long before the amendment to the Health and Safety Code. The amendment therefore is not controlling on this appeal.

Finally, judgment in this case does not depend for validity upon the use in evidence of the inspection reports. Such reports were cumulative in nature. Casa Blanca's defects are shown by a plethora of substantial evidence admitted on trial. This appeal court must view evidence in the light most favorable to respondent and in doing so, must look at the totality of evidence. (*Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 355 [282

P.2d 23, 51 A.L.R.2d 107].) If we strike inadmissible documents, the trial court's judgment still has overwhelming support.

IX

■ The trial court assessed $2,500 for each of 67 violations, or a total fine of $167,500. After a lengthy discussion of Casa Blanca's financial ability to pay an award, counsel for Casa Blanca agreed it could easily respond to an award of $250,000. Following this concession, presentation of further evidence on the subject of Casa Blanca's wealth and assets was not permitted.

Casa Blanca argues if an "unlawful pattern of business practices" was established and represented corporate conduct, then the maximum penalty of $2,500 should be imposed for each such *unlawful pattern* of business practice established. Under this view of violations of Business and Professions Code section 17536, a maximum of $15,000 in fines could be assessed. No authority supports such an interpretation of the statute.

Business and Professions Code section 17536 declares a person who "violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for *each violation* . . . ." (Italics added.) Thus, a *single* act in violation of regulations may constitute an unlawful business practice—a "*violation*" for which a penalty of up to $2,500 may be imposed. (*People* v. *Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 196 [157 Cal.Rptr. 628]; *People* v. *Superior Court (Jayhill Corp.)* (1973) 9 Cal.3d 283, 289 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191]; *People* v. *Bestline Products, Inc.* (1976) 61 Cal.App.3d 879 [132 Cal.Rptr. 767].) In *Bestline, supra,* a $2,500 penalty was authorized for each customer to whom misrepresentations were made. In *Olson, supra,* "each violation" occurred for each *publication* of a newspaper, plus an additional "violation" for each victim solicited. *People* v. *Witzerman* (1972) 29 Cal.App.3d 169, 180 [105 Cal.Rptr. 284], made a similar interpretation of "each violation." In *People* v. *McKale, supra,* 25 Cal.3d 626, 632, the court held "*violations*" were the single act of dumping of waste water on the premises or improper burial of underground electrical wiring.

To interpret the words "each violation" to authorize a $2,500 sanction for *each* and every failure to keep adequate patient records (over 1,000 in the penalty year) or for each day of "over bond" on patient deposits (364) would result in an unreasonable or oppressive statutory penalty. (*Hale* v. *Morgan,* 22 Cal.3d 388, 399.) On the other hand, to take all violations constituting evidence of a business practice in violation of a particular rule

or regulation and count them as only one violation would be equally unreasonable.

Either view would be in derogation of the legislative purpose in authorizing statutory fines. Civil fines are increasingly, in modern times, the means by which legislators implement statutory policy. (*Hale* v. *Morgan, supra,* 22 Cal.3d 388, at p. 398.) To accept Casa Blanca's interpretation would ignore the deterrent effect sought by the Legislature; nor would such penalty reasonably relate to the lucre garnered by Casa Blanca from its cumulative and blatant violations of the regulations. The difficulty of proof or interpretation of the statute's language is not so onerous as to undermine the effectiveness of the civil monetary penalty as an enforcement tool. (*People* v. *Superior Court (Olson), supra,* 96 Cal.App.3d at p. 198.)

The trial court, in seeking to effecutate the legislative purpose, examined a variety of relevant factors, including the number of violations of a specific regulation; the number of persons (victims) damaged by the violations; the number of institutions involved in the violations; the nature, the seriousness, the detrimental health impact of a particular violation; the kind, nature and extent of the deceptive misrepresentations involved; the nature and extent of the injury to the public from these abhorrent practices; and, finally, the size and wealth of Casa Blanca's enterprises. In light of all these factors, we conclude aggregation of certain multiple species of violations into a single "act" resulted in a more than fair and reasonable interpretation of the legislative intent and resulted in a more than reasonable penalty. To impose the maximum sanction for certain single egregious acts or conditions is equally fair and reasonable.

Severe sanctions were justified here because of Casa Blanca's repeated violations of patient care regulation. These were not isolated instances; multiple violations were not limited to a single one of Casa Blanca's nine houses but appeared in a number of the facilities. There were forgeries and malpractice coverups; violations with respect to the physical plant were proven to cost the life of at least one patient (Karen Gentles died as a result of scalding water). Financial gain appears to be Casa Blanca's motive. In one year Casa Blanca violated the no-patient deposits in excess of the posted surety bond for a total of 360 days. Assessment of only five fines, therefore, is more than equitable, a more than reasonable interpretation of the statute's language. Substantial evidence justified imposition of 67 maximum fines.

X

Finally, substantial evidence justified issuance of the injunction. The evidence showed breaches of the law, the regulations and flagrant mis-

conduct which was continued and repeated. (See *Volpicelli* v. *Jared Sydney Torrance Memorial Hosp.* (1980) 109 Cal.App.3d 242 [167 Cal.Rptr. 610].) The relief in such cases may be as wide and diversified as the means employed in perpetration of the wrongdoing. (*Wickersham* v. *Crittenden* (1892) 93 Cal. 17, 32 [28 P. 788].) There is more than substantial evidence to support the issuance of the injunction in this case. In view of our determination of the specific issues adversely to Casa Blanca, we do not and need not take judicial notice of the activities of Casa Blanca's attorneys in lobbying, going before the California Legislature and securing a change of the law.

## DISPOSITION

The judgment in all respects in affirmed.

Cologne, Acting P. J., and Wiener, J., concurred.

A petition for a rehearing was denied September 10, 1984.