[No. C010587. Third Dist. Sept. 9, 1992.]

SOUTHERN PACIFIC PIPE LINES, INC., Plaintiff and Appellant, v. BOARD OF SUPERVISORS OF SACRAMENTO COUNTY, Defendant and Respondent.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976.1, all parts of this opinion shall be published except part I, II, IIIA.2, B, C, part IV, and part V.

452

## Counsel

R. Gregory Cunningham, Burger & Flaherty, Trena H. Burger, Ralf Christe and Michael Pearce for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, Norman C. Hile, Kenneth C. Mennemeier, Martha Clark Lofgren, L. B. Elam, County Counsel, and Barry Steiner, Deputy County Counsel, for Defendant and Respondent.

## Opinion

**DAVIS, J.**—This is an action to invalidate an assessment district that was created to fund road improvements in the area of Sacramento County known as the Bradshaw Road/U.S. 50 Corridor. The plaintiff, Southern Pacific Pipe Lines, Inc. (SPPL), transports refined petroleum products by underground pipelines. SPPL owns and operates a refined petroleum products storage terminal on property within the proposed assessment district. SPPL filed its complaint in October 1988, seeking to have the assessments declared invalid on a variety of constitutional and statutory grounds, arguing that SPPL's assessed properties did not receive the "special benefit" necessary to justify the levying of a special assessment.

This matter comes to us after a grant of summary judgment in favor of defendant Sacramento County Board of Supervisors (Board). The trial court

rejected each of SPPL's challenges, finding that the administrative record supported the Board's determination of special benefit, and that SPPL's constitutional and statutory arguments failed as a matter of law. The trial court also denied SPPL's motion for leave to file an amended complaint to add a cause of action for fraud, finding that SPPL had inexcusably delayed in seeking leave to amend, in that SPPL had argued fraud in its briefs and oral argument more than a year before seeking leave to amend. We shall affirm.

In the published portion of this opinion, we consider and reject SPPL's contention that Government Code section 53178 is facially inconsistent with article XVI, section 19 of the California Constitution. In the unpublished portion of this opinion, we reject SPPL's remaining substantive and procedural challenges.

FACTUAL BACKGROUND

In July 1983, the Board retained The Spink Corporation (Spink) to prepare a preliminary engineering study for roadway improvements in the Bradshaw Road/U.S. 50 Corridor. In 1985, the Board began taking active steps toward the creation of the assessment district at issue. In June 1985, the Board obtained an exclusive option to acquire street improvements and traffic signal modifications, constructed by a developer, that were "part of the proposed work for the Bradshaw/U.S. 50 Corridor Assessment District" once the district was complete (Butterfield Way Improvements). In September 1985, the Board passed a resolution declaring the necessity of major roadway improvements in the area roughly bounded by Folsom Boulevard on the north, Kiefer Boulevard on the south, Mayhew Road on the west, and Routier Road on the east, designated the "Bradshaw Road/U.S. 50 Corridor Assessment District." The resolution further declared that the Board had preliminarily determined to fund these improvements by levying special assessments on the properties within this proposed assessment district and set a time for a public hearing on the proposal.

After notice, the Board held a public hearing on October 22, 1985. In November 1985, the Board determined it would proceed with the improvements and adopted a resolution of intention, in which the Board directed the county engineer to make a report addressing all necessary matters. Later that month, the Board again retained Spink to perform additional engineering services related to the proposed assessment district.

In August 1987, the director of the county's department of public works advised the Board that Spink had submitted a draft preliminary engineer's report in March 1987, and that Spink, along with county staff and bond

counsel, had been working together since that time on adjustments to the proposed assessment district's boundaries and assessment spread.

On April 5, 1988, the director of the county's department of public works recommended, and the Board adopted, a resolution rescinding the previous resolutions concerning the proposed assessment district "[u]pon advice of Bond Counsel . . . due to the time lapse since the previous Resolutions were adopted, engagement of new bond counsel, and minor changes in the scope of improvements to be constructed." The Board then adopted a resolution of intention to acquire and construct public improvements within the proposed assessment district, which would be funded through special assessments upon the properties in that district. The Board also adopted resolutions to undertake proceedings and issue bonds to acquire and construct the improvements; to appoint the director of public works and county engineer as the engineer of work overseeing all engineering work in connection with these improvements; to approve a map of the proposed boundaries of the assessment district; to approve the engineer's report on the proposed improvements; and to determine that public convenience and necessity required proceeding without complying with the Special Assessment Investigation, Limitation and Majority Protest Act of 1931 and setting a time for public hearing. The Board passed these resolutions under the authority of the Integrated Financing District Act of 1986 (Gov. Code, §§ 53175-53199) and the Municipal Improvement Act of 1913 (Sts. & Hy. Code, §§ 10000-10706).

The proposed improvements included widening existing roads, providing new or upgraded channelization and signalization, associated storm drainage, utility relocations, right-of-way acquisitions, acquiring the Butterfield Way Improvements, and curb, gutter, and sidewalk relocation or improvements. The county's environmental impact section also submitted its initial study and negative declaration for the proposed assessment district. Both the engineer's report and the initial study refer to a "Traffic Analysis for the Bradshaw Assessment District" prepared by TJKM Transportation Consultants.

The Board held five public hearings on the proposed assessment district on May 10, 1988, May 31, 1988, June 14, 1988, August 2, 1988, and September 13, 1988. In addition to oral protests to the proposed assessment district made during these public hearings, the Board also received a number of written protests. The Board generated written responses to the oral and written protests submitted. The protests resulted in changes to the assessment district, including modifications to some assessments, that were sufficiently significant so as to require changes to the engineer's report and the adoption of a resolution to order changes in the assessment proceedings.

SPPL was among the property owners that made both oral and written protests to the proposed assessment district. SPPL made oral protests at four of the five public hearings, and submitted four written protests. SPPL's protests contended that the proposed assessment was invalid because the improvements would create a benefit to the general public but the properties within the district would bear the entire cost; SPPL's property would derive no benefit from the improvements; the traffic factors upon which assessments were based did not accurately reflect the traffic actually generated on SPPL's property; various properties were improperly excluded from the district, including private homeowners, churches and schools; the Board failed to comply with the Special Assessment Investigation, Limitation and Majority Protest Act of 1931 in violation of the California Constitution; and a viable majority protest was not possible because protest waivers had been required from property owners as a condition of obtaining zoning changes.

At the conclusion of the public hearings, the Board passed Resolution No. 88-2309, which overruled the objections to the assessment district, adopted the revised engineer's report and recommendations, and confirmed the assessments. The Board also adopted Ordinance No. 1348, setting forth the procedures for levying and collecting the contingent assessments. SPPL's property within the assessment district is zoned for industrial use, and was assessed at the rate of $9,619.60 per acre. Due to SPPL's ownership of more than 30 acres within the assessment district, SPPL's total assessment was in excess of $300,000.

## Procedural Background

On October 13, 1988, SPPL filed a complaint seeking to invalidate the assessments, enjoin the enforcement of the assessments, and obtain a refund of assessments already paid. On November 14, 1988, the Board filed its answer, generally denying the complaint's allegations and raising a number of affirmative defenses.

This matter has been litigated aggressively, and the record is voluminous. We need not recite each motion pursued by the parties, but merely will note those of particular relevance to this appeal. SPPL commenced discovery, including depositions, requests for admission, interrogatories, and requests for production of documents. SPPL obtained some additional information through these methods and was thwarted by motions for protective orders in others.

The parties stipulated to an April 10, 1989, trial date. In February 1989, both SPPL and the Board filed motions for summary judgment. On March

21, 1989, the trial judge referred all law and motion matters to a referee, the Honorable Bertram D. Janes (Referee), with the consent of the parties. (See Civ. Proc. Code, § 638.) At the Referee's suggestion, the parties obtained an open continuance of the trial date and suspension of the Accelerated Civil Trial Program deadlines.

Due to various delays, the first ruling issued by the Referee occurred on January 29, 1990, when the Referee ordered the Board to produce some additional public records within the scope of SPPL's document request, pursuant to a motion by SPPL to compel production of documents. On March 26, 1990, SPPL moved for leave to file an amended complaint to add allegations of fraud. Further delays and continuances carried the date for argument of the summary judgment motions and the motion for leave to file an amended complaint to October 18, 1990.

On November 9, 1990, the Referee granted the Board's motion for summary judgment, and denied SPPL's summary judgment motion as moot and its motion for leave to amend as untimely. The Referee concluded that the administrative record supported the Board's determination that the assessed properties would receive a special benefit from the improvements and that SPPL's constitutional and statutory challenges failed as a matter of law. The Referee also concluded that SPPL had inexcusably delayed in seeking leave to amend, inasmuch as SPPL had argued theories of fraud in its briefs and oral arguments more than a year before bringing its motion. On January 10, 1991, the trial court entered judgment accordingly. This appeal followed.

OVERVIEW

SPPL's arguments focus primarily on the determination of benefit to the assessed properties within the proposed assessment district, contending both that the proposed improvements generate a benefit to the general public toward which the public should contribute, and that, for a number of reasons, the special benefits to the assessed properties were improperly ascertained. SPPL challenges the determination of special benefit on the basis of the exclusion of residential properties from the assessment district; the division of the cost of the improvements among the assessed properties rather than assessments based upon the actual increase in property value due to the improvements; the exclusion of properties along the north side of Folsom Boulevard from the district's boundaries; and perceived flaws in reports generated which made recommendations regarding the composition of the proposed district. From these challenges to the special benefit determination flow several derivative arguments. SPPL contends that because the assessments are not proportional to the special benefits received by the assessed

properties, the assessments violate due process and equal protection principles and constitute developer fees or "special taxes."

SPPL also sets forth arguments pertaining to the procedure employed by the Board in establishing the assessment district, contending that the property owners were denied their due process procedural safeguards because the Board did not comply with the provisions of the Special Assessment Investigation, Limitation and Majority Protest Act of 1931; and that protest waivers executed by some of the property owners as a condition of zoning changes served, in essence, to prevent a viable majority protest.

SPPL next makes several contentions that are not cognizable on appeal because they were not properly raised in earlier proceedings. Among these contentions are challenges to the acquisition of the Butterfield Way Improvements as unauthorized expenditures constituting an unconstitutional gift of public funds or reimbursement to the developer in contravention of statutory authority. SPPL also contends that the use of contingent assessment proceeds to reimburse the county for expenses related to the assessment district exceeds the permissible use of such proceeds as set by statute.

Finally, SPPL argues error in the rulings of the trial court denying SPPL leave to amend its complaint and in granting the Board's motion for summary judgment before SPPL had completed all outstanding discovery.

The Referee's decision, which was adopted by the trial court, concluded that "the Board's benefit determination is supported by the Record and judicially noticeable facts and . . . SPPL has not presented evidence to create a triable issue of fact to the contrary. . . . As to SPPL's argument that benefit to the general public invalidates the assessments, the Referee concludes that any benefit to the general public is incidental." With regard to SPPL's other claims, the Referee found that (1) the Legislature validly made the Special Assessment Investigation, Limitation and Majority Protest Act of 1931 inapplicable to assessment districts formed in conjunction with the Integrated Financing District Act and moreover that the evidence is undisputed that there was no majority protest; (2) protest waivers are legally valid and the property subject to such waivers did not aggregate to a majority of the property within the district; and (3) leave to amend was denied as untimely and as creating prejudice to the Board. "SPPL has failed to present the Referee with sufficient justification for the delay in presenting the proposed amendment. . . . [T]here is substantial evidence that SPPL had considered these same theories in its motion for summary judgment filed in February 1989 and in its oral argument on the discovery motions heard by the Referee in October 1989."

DISCUSSION

I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. CONTENTIONS OF PROCEDURAL ERROR BY THE BOARD IN ESTABLISHING ASSESSMENT DISTRICT

SPPL contends that the Board violated SPPL's due process rights by precluding SPPL and other assessees from effectively availing themselves of due process procedural safeguards. Specifically, SPPL contends that the Board (1) failed to comply with the Special Assessment Investigation, Limitation and Majority Protest Act of 1931 (Majority Protest Act); (2) minimized the possibility of a majority protest by obtaining protest waivers from other property owners as a condition of granting upzones; (3) hired a consultant to prepare an engineer's report that lacked any factual basis and "was designed solely to support the Board's predetermined plan"; (4) conducted the hearings required on a pro forma basis "to comply with the letter of the law, [but] fully intending to disregard all protests and objections that would require a deviation from the Board's plan"; and (5) excluded unfavorable evidence from the administrative record to prevent successful challenges to the assessments.

### A. Majority Protest Act

#### 1. Constitutionality of Integrated Financing District Act of 1986

SPPL contends that, pursuant to the California Constitution, special assessments may only be passed in accordance with the Majority Protest Act. (See Cal. Const., art. XVI, § 19.) Anticipating the Board's response that the Integrated Financing District Act of 1986 (IFD Act) exempts proceedings under that title from the Majority Protest Act's provisions, SPPL contends that the conflict between the constitutional and statutory provisions renders any exemption unconstitutional. The trial court concluded that the Legislature validly made the Majority Protest Act inapplicable to assessments formed in conjunction with the IFD Act, and that SPPL's argument failed in any event because it was undisputed that there was no majority protest.

 Legislatures are presumed to have acted constitutionally. (*Goodman v. Cory* (1983) 142 Cal.App.3d 737, 744 [191 Cal.Rptr. 272].) Statutes must

*See footnote, *ante*, page 451.

be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. (*People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 528 [206 Cal.Rptr. 164, 53 A.L.R.4th 661]; *Eden* v. *Van Tine* (1978) 83 Cal.App.3d 879, 886 [148 Cal.Rptr. 215, 12 A.L.R.4th 856].) Whenever possible, statutes are construed to avoid unconstitutionality. (*Midway Orchards* v. *County of Butte* (1990) 220 Cal.App.3d 765, 776 [269 Cal.Rptr. 796]; *Palmer* v. *City of Ojai* (1986) 178 Cal.App.3d 280, 291 [223 Cal.Rptr. 542].) Rules of construction and interpretation that are applicable to interpreting statutes are equally applicable in interpreting constitutional provisions. (*Winchester* v. *Mabury* (1898) 122 Cal. 522, 527 [55 P. 393].)

■ In construing a statute, we must ascertain the intent of the Legislature so as to effectuate the purpose of the law. The provision under scrutiny must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which, upon application, will result in wise policy rather than mischief or absurdity. We take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction. (See *Monzon* v. *Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16, 30 [273 Cal.Rptr. 615]; *San Diego Union* v. *City Council* (1983) 146 Cal.App.3d 947, 954 [196 Cal.Rptr. 45].) The various parts of a statute must be harmonized by considering each clause or section in the context of the statutory framework as a whole. (*Simpson* v. *Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 352 [231 Cal.Rptr. 690].)

With these guidelines in mind, we turn to the provisions at issue, and address the question presented to us as posed by the facts of this appeal. Article XVI, section 19, of the California Constitution provides, "All proceedings undertaken by . . . any chartered county . . . for the construction of any public improvement, or the acquisition of any property for public use, or both, where the cost thereof is to be paid in whole or in part by special assessment . . . shall be undertaken only in accordance with the provisions of law governing: . . . (e) postponement or abandonment, or both, of such proceedings in whole or in part upon majority protest, and particularly in accordance with such provisions as contained in Sections 10, 11 and 13a of the Special Assessment Investigation, Limitation and Majority Protest Act of 1931 or any amendments, codification, reenactment or restatement thereof. [¶] Notwithstanding any provisions for . . . majority protest as in this section provided, if, after the giving of such reasonable notice by publication and posting and the holding of such public hearing as the legislative body of

any such chartered county . . . shall have prescribed, such legislative body by no less than a four-fifths vote of all members thereof, finds and determines that the public convenience and necessity require such improvements or acquisitions, such . . . majority protest provisions shall not apply."

The IFD Act permits the levy of a contingent assessment upon property owners within the integrated financing district which is contingent upon the development of their land, together with a specified noncontingent assessment levied pursuant to various specified improvement acts. (Gov. Code, §§ 53175-53199.) Section 53178 of the Government Code provides that the Majority Protest Act does not apply to IFD Act proceedings, stating: "Division 4 (commencing with Section 2800) of the Streets and Highways Code does not apply to proceedings taken under or in conjunction with this chapter." Division 4 is the Majority Protest Act. (Sts. & Hy. Code, § 2800.)

When the Majority Protest Act first was enacted, it applied both to chartered and nonchartered cities and counties. However, in 1932 the California Supreme Court held the act was unconstitutional as applied to chartered cities. (*McClain* v. *Wirsching* (1932) 215 Cal. 469 [11 P.2d 392].) After this decision, many chartered cities began ignoring the act, prompting a constitutional amendment to broaden the act's application to include chartered cities and counties. The constitutional amendment sought to make the Majority Protest Act "as nearly as possible apply to chartered cites and counties. [¶] Under the . . . Supreme Court decision . . . a simple majority of the city council of a chartered city can create a special assessment district . . . in spite of a 100% protest by the property owners involved and in spite of the fact that the assessments equal far more than 100% of the true value of the property in the proposed [integrated financing district]. [¶] The will of the majority of the property owners involved should in all fairness govern, but the records show conclusively that there have been many grave abuses by chartered cities where the will of even 100% of the property owners involved has been flouted and ignored." (Ballot Argument in Favor of Assembly Constitutional Amendment No. 79.)

■ The purpose behind article XVI, section 19, of the California Constitution, was to ensure that when a majority of affected property owners opposed the imposition of an assessment, that majority was provided with a procedural mechanism for protesting the assessment. The constitutional language supports such an interpretation: "proceedings . . . shall be undertaken only in accordance with the *provisions of law* governing . . . postponement or abandonment . . . of such proceedings . . . upon majority protest,

and particularly in accordance with such provisions as contained in . . . the Special Assessment Investigation, Limitation and Majority Protest Act of 1931 *or any amendments, codification, reenactment or restatement thereof.*" (Cal. Const., art. XVI, § 19.) (Italics added.) The Majority Protest Act thus is specifically cited as an *approved example* of a procedural mechanism for protesting special assessments. This underlying concern is protected by the protest provision within the IFD Act. (See Gov. Code, § 53183, subd. (d).) We therefore reject SPPL's argument that Government Code section 53178 is inconsistent with the California Constitution.

The IFD Act contains a separate section specifically dealing with procedures for protesting an assessment. (Gov. Code, § 53183.) In particular, this section provides that if a "protest is made by the owners of more than one-half of the area of the property within the proposed integrated financing district which is proposed to be subject to the contingent assessment immediately or in the future, or which is proposed to be subject to a levy made pursuant to a financing act immediately or in the future, and protests are not withdrawn so as to reduce the same to less than a majority, no further proceedings to levy the specified contingent assessment shall be taken pursuant to this chapter for a period of one year from the date of the decision of the legislative body on the hearing." (Gov. Code, § 53183, subd. (d).) The import of this provision is strikingly similar to the Majority Protest Act, which provides that if written protests are filed by the owners "of a majority of the frontage of the property fronting on the acquisition or improvement in those cases where the cost in whole or part of the acquisition or improvement is to be assessed upon the property fronting on the acquisition or improvement, or by the owners of more than one-half of the area of the property to be assessed for the acquisition or improvement in those cases where the cost in whole or part of the acquisition or improvement is to be assessed upon the property within a district, and protests are not withdrawn so as to reduce the same to less than a majority, then the proposed proceedings shall be forthwith abandoned, and the legislative body shall not for one year from the filing of that written protest commence or carry on any proceedings for the same improvement or acquisition." (Sts. & Hy. Code, § 2930.)

We further note that the Majority Protest Act is a statute and thereby subject to amendment by the Legislature. Moreover, the Majority Protest Act itself contains various exemptions from its application. (Sts. & Hy. Code, §§ 2804, 2806, 2808.)

Had there been a majority protest, the IFD Act would have required that the Board abandon the proceedings. (See Gov. Code, § 53183, subd. (d); Sts.

& Hy. Code, § 10301.) However, it is undisputed that there was no majority protest or any evidence that a majority of the affected property owners opposed the assessments. SPPL ' suffered no prejudice from the Board's proceedings. (See Code Civ. Proc., § 866 [in validating proceedings, court "shall disregard any error, irregularity, or omission which does not affect the substantial rights of the parties"].)

III.A.2.-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. The Board shall recover its costs on appeal.

Sims, Acting P. J., and Nicholson, J., concurred.

---

*See footnote, *ante*, page 451.