Filed 10/4/23

## CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PARRIS J.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER U.,<br><br>    Defendant and Appellant. | B313470; B316247;<br>B317613<br><br>Los Angeles County<br>Super. Ct. No.<br>19STFL13412 |

APPEAL from orders of the Superior Court of Los Angeles County, Mark A. Juhas, Judge. Affirmed.

Law Offices of Gregory R. Ellis and Gregory R. Ellis, for Defendant and Appellant.

Goodwin Proctor, Alexis Coll-Very, Sylvia Ewald; Family Violence Appellate Project, Shuray Ghorishi, Cory Hernandez and Jennafer Dorfman Wagner, for Plaintiff and Respondent.

Morgan, Lewis & Bockius, Thomas M. Peterson and Pejman Moshfegh for Domestic Violence Legal Empowerment and Appeals Project, Stopping Domestic Violence, California Protective Parents Association, Center for Domestic Peace, Sanctuary for Families, The National Family Violence Law Center at George Washington University Law School, the Law Foundation of Silicon Valley, California Women's Law Center, Community Overcoming Relationship Abuse, Los Angeles Center

for Law and Justice, and Women Lawyers Association of Los Angeles, as Amici Curiae on behalf of Plaintiff and Respondent.

_____

**INTRODUCTION**

Christopher U. appeals from the five-year domestic violence restraining order (DVRO) issued against him at the request of his former spouse, Parris J.[1] He contends the trial court abused its discretion by granting Parris's request for a DVRO because the record does not demonstrate he engaged in conduct rising to the level of abuse under the Domestic Violence Prevention Act (DVPA), Family Code[2] section 6200 et seq. Christopher also asserts the trial court erred by ordering him to change the beneficiary of the $4 million insurance policy he owns on Parris's life from himself to a charity of her choice, and by failing to grant his requests for a statement of decision. Lastly, Christopher argues that because the DVRO must be reversed, the trial court's order awarding $200,000 in attorneys' fees to Parris as the prevailing party under section 6344 must also be reversed.

As discussed below, we conclude the trial court did not abuse its discretion by granting Parris's request for a DVRO. In addition, we reject Christopher's contentions regarding the life insurance policy. Thus, we have no reason to reverse the order awarding attorneys' fees to Parris. We also conclude reversal is not required based on the denial of Christopher's requests for a statement of decision. Accordingly, we affirm.

_____

1  Per this court's order filed March 22, 2023, this opinion refers to the parties by first name and last initial.

2  All further undesignated statutory references are to the Family Code.

## BACKGROUND

## I.     Factual Background[3]

Parris and Christopher began dating in October 2017. At the time, Parris was 27 years old and Christopher was 48 years old. Parris was working as a personal assistant and living with a male roommate in San Francisco. Christopher lived in West Hollywood.

At the end of 2017, Parris began a full-time graduate program to pursue a master's degree in business administration. She moved in with Christopher in April 2018.

The parties became engaged in February 2019. In late March 2019, Christopher purchased a $4 million insurance policy on Parris's life for his benefit (the "Life Insurance Policy"). According to Parris, Christopher told her the policy's death benefit was $1 million, and she only became aware of the actual amount of the death benefit through discovery in the underlying proceedings.

Parris and Christopher were married in late May 2019. Christopher paid for the wedding, which cost approximately $250,000 to $300,000. Two weeks later, Parris started an internship with the Bank of America in Charlotte, North Carolina. Christopher found an apartment in Charlotte for Parris to live in, rented it solely in his name, and paid for her rent throughout her 10-week internship.

_____

3      In this section of the opinion, we limit our discussion of the facts to the main events giving rise to the underlying action. In the Discussion section, *post*, we discuss in detail several events and interactions that took place during the parties' relationship and after the date of separation.

In July 2019, the parties got into multiple disagreements, which led them to engage in heated arguments via text messages for several weeks. In his messages to Parris, Christopher repeatedly insulted, berated, and demeaned her. He also accused Parris of cheating on him numerous times. On several occasions, he told Parris he was kicking her out of their home. Among other things, he stated he was going to change the locks, that he would not let Parris back into their home, that he had packed up her belongings, and that he intended to ship them to Parris or her parents. Christopher also threatened Parris via text messages and e-mail, and told her that he would burn and donate all the things he had bought for her.

Parris testified Christopher's threats to dispose of her belongings made her "extremely concerned." Thus, on July 27, 2019, Parris flew from Charlotte to Los Angeles. Upon arrival, she called the police to escort her into Christopher's home because she "was extremely terrified of him." Parris then retrieved her belongings, moved them to a storage unit, and returned to Charlotte to finish her internship. Christopher was not present when Parris moved out. The parties treated Parris's move-out date as the date of their separation.

Less than a week later, on August 2, 2019, Christopher flew to Charlotte and went to Parris's apartment without her prior knowledge or consent. He arrived at about 2:30 or 3:00 p.m. and used spare keys provided to him by the landlord to enter the apartment through the back door. Parris later returned to the apartment after running an errand and saw Christopher inside.

Parris testified Christopher's unannounced arrival to her apartment scared her. She believed he was only there because he was furious she moved her things out of his home. Because she

did not want to be alone in the apartment with him, they went to a brewery at approximately 3:30 or 4:00 p.m. Subsequently, they went to a cigar shop, a restaurant, and a bar.

The parties did not return to the apartment until late in the evening. At trial, they offered conflicting testimony regarding the events that took place thereafter. The evidence is undisputed, however, that between 1:00 a.m. and 6:00 a.m., Parris tried to leave the apartment, but Christopher prevented her from doing so. Ultimately, Parris slept in her bedroom, and Christopher slept on the couch. Parris left the apartment at 7:00 or 8:00 a.m. the next day, when a few of her friends with a spare key let themselves in and escorted her out.

Between August and November 2019, the parties continued to communicate by e-mail. Shortly after the incident in Charlotte, Christopher expressed remorse for his actions and tried to reconcile with Parris. In response, Parris indicated she did not wish to continue their relationship, and suggested they amicably settle their affairs and part ways. Subsequently, Christopher repeatedly accused Parris of cheating on him, insulted her, cursed at her, and called her countless lewd and demeaning names. He also threatened her and her family many times. Consequently, in October and November 2019, Parris told Christopher to stop contacting her.

## II. Procedural Background

On November 15, 2019, Parris filed a request for a DVRO against Christopher. The trial court entered a temporary restraining order (TRO) in her favor the same day. Several months later, on April 1, 2020, Christopher filed a request for a DVRO against Parris and was issued a TRO in his favor later that day.

On March 29, 2021, Parris filed a request for an order compelling Christopher to either cancel the Life Insurance Policy or change the beneficiary from himself to a charity of her choosing. She also asked the trial court to consider his refusal to cancel the Life Insurance Policy to be "a separate and further act of domestic violence against [her] . . . ." The trial court ultimately decided the matter as part of the trial on the parties' DVRO requests.

Trial began on May 19, 2021, and ended on June 4, 2021. After the parties presented their closing arguments, the trial court issued an oral decision granting a five-year DVRO in Parris's favor. As a part thereof, the court ordered Christopher to change the beneficiary on the Life Insurance Policy to a charity of Parris's choice, and prohibited Christopher from changing the beneficiary while the DVRO was in place. It then denied Christopher's request for a DVRO. We set forth the court's rulings relating to Parris's requests in the Discussion section, *post*.

Christopher timely appealed from the DVRO.

On July 6, 2021, Parris filed a request for attorneys' fees and costs pursuant to section 6344. She ultimately sought a fee award of $227,380.29. On September 9, 2021, the trial court awarded Parris $200,000 in attorneys' fees, finding the amount to be reasonable, and that Christopher had the ability to pay both his and Parris's fees. Christopher timely appealed from the attorneys' fees order.

On November 4, 2021, the trial court entered a first amended DVRO, which reflected the parties' stipulation to stay enforcement of the DVRO's directive requiring Christopher to change the beneficiary of the Life Insurance Policy while his

6

appeals from the trial court's orders were pending. Christopher timely appealed from the first amended DVRO.

Christopher later moved to consolidate the three appeals arising out of the trial court's orders. We granted his motion on February 28, 2022, and consolidated cases B313470, B316247, and B317613 for purposes of briefing, oral argument, and decision.

On April 22, 2022, the trial court entered a second amended DVRO, which corrected a clerical error in the stipulation attached to the first amended DVRO. Subsequently, on June 10, 2022, we granted Christopher's unopposed request to construe his notice of appeal filed on December 23, 2021 to encompass the second amended DVRO.

## DISCUSSION

### I.    Governing Principles and Standard of Review

"Under the DVPA, a court is authorized to issue a protective order "'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved'" upon 'reasonable proof of a past act or acts of abuse.'" (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11 (*Curcio*).) The DVPA defines "abuse" as "any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a).) "Abuse is not limited to the actual infliction of physical injury or assault." (*Id.*, subd. (b).)

Behavior that may be enjoined under section 6320 includes "disturbing the peace of the other party[.]" (§ 6320, subd. (a).) As used in the DVPA, "'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty. Examples of coercive control include, but are not limited to, unreasonably engaging in any of the following: [¶] (1) Isolating the other party from friends, relatives, or other sources of support. [¶] (2) Depriving the other party of basic necessities. [¶] (3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services. [¶] (4) Compelling the other party by force, threat of force, or intimidation . . . to engage in conduct from which the other party has a right to abstain or to abstain from conduct in which the other party has a right to engage. [¶] (5) Engaging in reproductive coercion, which consists of control over the reproductive autonomy of another through force, threat of force, or intimidation . . . ." (§ 6320, subd. (c).)

"The DVPA vests the court with discretion to issue a restraining order 'simply on the basis of an affidavit showing past abuse.' [Citation.] The burden of proof is by a preponderance of the evidence. [Citations.] The DVPA 'confer[s] a discretion designed to be exercised liberally, at least more liberally than a

8

trial court's discretion to restrain civil harassment generally.'" (*Curcio*, *supra*, 47 Cal.App.5th at p. 11.)

"We review the grant of a DVPA restraining order for abuse of discretion, and, to the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review. [Citation.] In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings. [Citation.] We must accept as true all evidence supporting the trial court's findings, resolving every conflict in favor of the judgment. [Citation.] We do not determine credibility or reweigh the evidence. [Citation.] If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding." (*Curcio*, *supra*, 47 Cal.App.5th at p. 12.)

## II.  Analysis

### A.  Christopher did not forfeit his challenges to the DVRO by failing to present evidence supportive of the trial court's rulings.

Preliminarily, we address Parris's contention that we need not consider the merits of Christopher's arguments on appeal. Relying on *Ashby v. Ashby* (2021) 68 Cal.App.5th 491 (*Ashby*), Parris contends Christopher forfeited his arguments because he "fail[ed] to present material evidence fairly, and sometimes not at all." She then identifies a number of facts which, in her view, support the trial court's orders, but were improperly omitted from and/or misleadingly presented in Christopher's opening brief on appeal. For the reasons discussed below, we are not persuaded by Parris's argument.

9

In *Ashby*, the appellate court determined the appellant forfeited his argument challenging the sufficiency of the evidence underlying the renewal of a DVRO entered in favor of his ex-wife. (*Ashby*, *supra*, 68 Cal.App.5th at p. 511.) In so doing, the court noted the appellant's "account of the case's procedural history ignore[d] significant events in the case." (*Id.* at p. 512.) It also observed the appellant's factual summary and legal analysis "set[ ] forth a one-sided narrative of events[,]" and did not describe the evidence supporting the DVRO's issuance. (*Id.* at p. 513.) Ultimately, the appellate court concluded the appellant "set forth only favorable evidence, which if viewed in isolation may have compelled a different result but did not prove the [trial] court abused its discretion in renewing the DVRO." (*Ibid.*)

Here, Parris aptly observes Christopher presents the facts in a manner favorable to him by highlighting the evidence and omissions supportive of the arguments raised later in his opening brief. His opening brief does not, however, entirely omit all the facts supporting the trial court's rulings. (Cf. *Ashby*, *supra*, 68 Cal.App.5th at p. 513.) While Christopher tends to omit details that would, if included, arguably cast him in a negative light, he does discuss the key events about which Parris testified at trial. Christopher also acknowledges he sent text messages and e-mails to Parris containing "obscene comments[,]" and that he "sometimes yelled at [Parris] when he was angry." In addition, he sets forth the trial court's oral decision in detail and thereby discusses the evidence underlying its conclusions.

Under these circumstances, we are not persuaded by Parris's contention that Christopher forfeited his arguments on appeal because he "fail[ed] to cite and accurately present

significant, material evidence supporting [the court's] orders[.]" We, therefore, address his arguments on the merits.

**B.    Substantial evidence supports the trial court's conclusion that Christopher disturbed Parris's peace.**

**1.    Relevant Background**

In granting a DVRO in Parris's favor, the trial court found Christopher disturbed her peace and harassed her. It also found he used money, power, and emotional abuse to control her. In support of these findings, the court observed: (1) Christopher "was very disrespectful" in the ways he addressed and talked to Parris in his text messages to her; (2) his text messages showed "[h]e called her all sorts of names" in order "to keep her off balance and maintain control"; (3) in his testimony at trial and text messages to Parris, he repeatedly discussed how he paid a lot of money for the wedding; and (4) he offered to pay some of Parris's bills if she gave him the text messages between her and her friends to prove she did not cheat on him.

With respect to the August 2019 incident in Charlotte, the trial court found the parties' different narratives "equally as credible in some respect[s] [but] equally non-credible in others." Without resolving the conflicts in the evidence, the court concluded the undisputed evidence showed Christopher "was in control of the apartment in North Carolina." On this point, it noted Christopher referred to the apartment as "his apartment" several times, and that the landlord called *him* to report Parris was making noise or having guests, including men, over at the apartment.

11

Lastly, the trial court determined Christopher violated Parris's TRO against him by sending disparaging letters to her employer. It found this act, on its own, was sufficient to justify entering a DVRO in Parris's favor.

### 2. Analysis

In arguing the DVRO must be reversed, Christopher asserts: "Parris did not sustain her burden of proving by a preponderance of the evidence that [he] abused her under the DVPA. That is, the body of evidence viewed objectively under the totality of the circumstances fell far short of establishing harassment, disturbing the peace, or coercive control rising to the level of abuse." In support of this position, he appears to raise two arguments, which we address in turn below.

### a. Arguments Regarding Christopher's Interpretation of Section 6320

First, Christopher contends the legislative history underlying the amendments to the DVPA enacted in 2020 "reflect[ ] the Legislature's intent that a finding of non-physical abuse under the [DVPA] be subject to a reasonable person standard . . . ." Therefore, he argues, when deciding whether a person's actions "disturb[ed] the peace of the other party" under section 6320, courts must determine whether the conduct at issue would have objectively destroyed the mental or emotional calm of a reasonable person. As discussed below, we do not agree with his argument.

Christopher's contention presents a question of statutory interpretation, which requires us to "ascertain the Legislature's intent so as to give effect to the law's purpose." (*In re Corrine W.* (2009) 45 Cal.4th 522, 529.) "We begin with the statute's plain

12

language, as the words the Legislature chose to enact are the most reliable indicator of its intent." (*Ibid.*)

As noted above, section 6320, subdivision (c), provides, in relevant part: "'[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." This provision contains no language suggesting that a reasonableness standard governs whether someone "disturb[ed] the peace of the other party." (See § 6320, subd. (c).) When defining other behaviors that constitute "abuse" under the DVPA, however, the Legislature has expressly and unambiguously stated when a reasonableness standard applies. (See, e.g., § 6203, subd. (a)(3) [conduct "plac[ing] a person in *reasonable* apprehension of imminent serious bodily injury to that person or to another" is "abuse" under the DVPA] (italics added); § 6320, subd. (c) ["coercive control" is "a pattern of behavior that in purpose or effect *unreasonably* interferes with a person's free will and personal liberty" (italics added)].) Consequently, by omitting similar language from its definition of "disturbing the peace of others[,]" the Legislature deliberately chose not to limit the DVPA's reach to conduct that would destroy the mental or emotional calm of a reasonable person. (See *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 ["'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded'"].)

Having concluded Christopher's interpretation of section 6320 is unsupported by the statute's unambiguous language, we need not consider the legislative history. (See *In re Marriage of*

*Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*) [""If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs""].) In any event, we reviewed the relevant legislative history and conclude it also does not support his argument.

In 2020, the Legislature amended section 6320 to: (1) define the term "disturbing the peace of the other party" as used in section 6320 based on relevant case law; (2) specify "disturbing the peace of another party" includes, but is not limited to, "coercive control"; (3) define the term "coercive control"; and (4) provide a non-exhaustive list of examples of conduct amounting to "coercive control." (See Stats. 2020, ch. 248, § 2; Sen. Bill No. 1141 (2019-2020 Reg. Sess.) (SB 1141); see also Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill. No. 1141 (2019-2020 Reg. Sess.) as amended Aug. 6, 2020, p. 3.)

Christopher relies heavily on the Senate Judiciary Committee's analysis, conducted in May 2020, of an early version of SB 1141. At the time, the Senate Judiciary Committee noted SB 1141 "establishe[d] narrow parameters to limit the application of its provisions to clearly abusive behaviors." (Sen. Com. on Judiciary, Analysis of Sen. Bill. No. 1141 (2019-2020 Reg. Sess.) May 6, 2020, at p. 7.) It then stated: "The bill provides that a person's conduct constitutes coercive control only if all of the following are satisfied:

- the person intentionally, or with reckless disregard of the consequences, engages in a pattern of behavior that interferes with the will of the victim;

14

- the person intends to cause the victim severe emotional distress, or a reasonable person would know that the conduct would be likely to cause the victim severe emotional distress;
- the victim does suffer severe emotional distress; and
- the person's conduct is not reasonable under the circumstances.

"These parameters – a mental state, objective unreasonableness, causation, foreseeable harm, actual harm – are all the types of elements commonly used in and [*sic*] torts, such as intentional infliction of emotional distress, and criminal provisions. These elements provide strong guardrails to help ensure that the bill will function as intended and not reach benign conduct that is ordinarily tolerated in relationships or that does not actually distress the person. Additionally, the requirement that the conduct be unreasonable under the circumstances helps ensure that the bill will not be used against a victim who takes reasonable coercive actions to defend themselves against an abuser." (*Ibid.*)

According to Christopher, the comments above show the Legislature intended an objective, reasonable person standard to govern the question whether conduct "disturb[s] the peace of the other party" for purposes of the DVPA. This argument is meritless because those comments do not relate to the Legislature's definition of the term at issue. They pertain to the May 2020 version of SB 1141, which only sought to "[a]mend[ ] the definition of 'abuse' under section 6203 to include 'coercive control,'" define what conduct constitutes coercive control, and "[l]ist[ ] types of conduct that may constitute coercive control[.]"

15

(Sen. Com. on Judiciary, Analysis of Sen. Bill. No. 1141 (2019-2020 Reg. Sess.) May 6, 2020, at p. 3.) The bill did not endeavor to define the term "disturbing the peace of the other party" until it was amended in August 2020. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill. No. 1141 (2019-2020 Reg. Sess.) as amended Aug. 6, 2020, p. 3.) In addition, while SB 1141 initially proposed a multi-element test to provide "strong guardrails" limiting the category of conduct constituting "coercive control," that test ultimately was not adopted. (See § 6320, subd. (c) ["coercive control is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty"].) Thus, we are not convinced the legislative history cited by Christopher shows the Legislature intended to incorporate a reasonable person standard into section 6320's definition of the term "disturbing the peace of the other party."

Christopher's reliance on *Curcio*, *supra*, 47 Cal.App.5th 1, is likewise unavailing. There, our colleagues in Division Three held that courts are not authorized to issue a DVRO "based on any act that upsets the petitioning party[,]" as "[t]he DVPA was not enacted to address all disputes between former couples, or to create an alternative forum for resolution of every dispute between such individuals." (*Id.* at p. 13.) Thus, the appellate court concluded the respondent's "single, private Facebook post accusing [the petitioner] of abusing her" did not "rise to the level of destruction of [the petitioner's] mental and emotional calm, sufficient to support the issuance of a domestic violence restraining order." (*Ibid*, italics and fn. omitted.) In acknowledging the DVPA's limits, however, the court did not hold or otherwise suggest that the analysis of whether conduct

"disturb[ed] the peace of the other party" under section 6320 is governed by an objective, reasonable person standard. (See *ibid.*)

In sum, for the reasons discussed above, we conclude Christopher has not shown that courts must apply an objective, reasonable person standard when deciding whether a person has "disturb[ed] the peace of the other party" within the meaning of section 6320. Instead, the relevant inquiry is simply whether the person against whom the DVRO is sought engaged in "conduct that, based on the totality of the circumstances, destroy[ed] the mental or emotional calm of the other party." (§ 6320, subd. (c).)

b. Arguments Based on the Evidence

Next, Christopher contends the evidence does not establish he engaged in conduct rising to the level of abuse under the DVPA. In support of his position, he argues: (1) rather than demonstrating abuse, Christopher's text messages "contain[ing] rude and sometimes obscene language" reflect the heated and emotional unwinding of the parties' "high conflict relationship"; (2) while the evidence showed he "had more available money and used it for [Parris's] benefit[,]" it did not establish he used money to isolate or control her; and (3) the letters Christopher sent to Parris's employer did not rise to the level of harassment because they were "not [part of] a pattern of harassment or disturbing [Parris's] peace of mind." For the reasons discussed below, we are not persuaded by Christopher's contentions.

As an initial matter, we note Christopher's first and second arguments are unaccompanied by citations to the record. It is well-settled that "[t]he appellate court is not required to search the record on its own seeking error[,]" and therefore where, as here, "a party fails to support an argument with necessary

17

citations to the record, the argument will be deemed [forfeited].” (*LA Investments, LLC v. Spix* (2022) 75 Cal.App.5th 1044, 1061.)

In any event, having reviewed the record, we conclude it contains substantial evidence to support a finding that Christopher disturbed Parris's peace and engaged in conduct amounting to coercive control. As discussed in detail below, the record reflects Christopher manipulated Parris into becoming financially dependent on him to keep her in the relationship and control her behavior. The evidence also demonstrates he controlled her behavior through emotional abuse. Specifically, it shows that whenever Parris did something Christopher disliked, he aggressively berated, insulted, and demeaned her, often using profanity and crude language to do so. Through this pattern of behavior, Christopher effectively, and unreasonably, coerced Parris into doing what he wanted without question to avoid further emotional abuse. And, his emotional abuse did not end upon the parties' separation. In addition to denigrating Parris incessantly, Christopher repeatedly threatened her and her family, and followed through on several of his threats.

Early on in their relationship, while Parris was living in San Francisco, Christopher accused her of cheating on him with her male roommate and told her he did not want her to live with another man. He demanded she give him the text messages she exchanged with her roommate, and threatened to get an attorney to obtain them from her. Eventually, Parris provided Christopher with the messages. In addition, although she could not afford the rent on her own, Parris moved into a studio because Christopher pressured her to do so and offered to cover the $600 to $700 increase in her rent. Parris testified Christopher did not help her with her rent, however.

In May 2018, Parris received $182,000 in a tort settlement. She had $30,000 in credit card debt at the time. Although she intended to pay off her entire debt, Christopher advised her to leave one-third of the balance to improve her credit. Parris followed his advice.

Parris testified that when the parties moved in together, Christopher stated he was going to cover her expenses while she was in graduate school. He also told her that he had a background in finance, that he worked in investments, and that he would help her invest her money. However, once Parris moved in with him, Christopher started asking her to cover his expenses. For example, he asked her to pay his daughter's nanny, his gardener, and his pool keeper; to buy groceries; and to wire him $15,000 to help him in a "business situation." Parris agreed to his requests because he stated he would repay her, and she trusted him. For a time, she kept a ledger to keep track of what she paid for. Christopher, however, never paid her back. Instead, Parris testified, whenever she brought the matter of repayment to Christopher's attention, he would call her an "ungrateful b[*]tch" and refer her to luxury items he had bought for her.

Soon after moving in together, Christopher told Parris she needed to get a car. Parris expressed interest in an older, used car. Christopher, however, encouraged her to get a newer, more expensive, model. When Parris told him she could not afford that car, he told her not to worry because he would pay for it. Parris then leased the car in her name. Christopher gave her $8,000 in cash to put toward the car, and she used $28,000 from her settlement funds for the down payment. The monthly payments for the car's lease and insurance totaled $1,800.

Parris also testified Christopher advised her to take out all the student loans offered to her, as they would pay it back later. As part of her loans, she received $13,000 twice per year for living expenses. Those funds were deposited directly into the bank account she used to pay Christopher's expenses, send him money, and give him cash to use for poker.

In addition, Parris testified that during their relationship, Christopher advised Parris to open two credit cards in her name, and to make him an authorized user on those cards. One was an American Express card, and the other a Barclays card. According to Parris, Christopher made a majority of the charges on these cards. Christopher used the American Express card to pay for a variety of his personal expenses and used the Barclays card almost exclusively to play online poker.

Parris testified that her personal bank account was depleted within six months. The amount in her "personal account was so low that [she] would have to ask [Christopher] to wire [her] funds just so [she] could go get gas." Parris testified Christopher "held [her] in that [financial] position up until . . . [they] got married." After the wedding, she started earning money at her internship. When their relationship ended, Parris had $160,000 in student loans and $50,000 in credit card debt.

Parris testified she did not have any designer clothes when the parties started dating. Christopher told her she "looked like sh[*]t in [her] outfits from JCPenny's, and so he . . . b[ought] [her] new things and directed what [she] w[ore] when [they] w[ent] out." When asked why she bought him expensive gifts for holidays and his birthday, she testified: "At first, I got him gifts that I thought were appropriate, and he responded poorly and

was quite rude. So I started buying him nicer things that he was more accepting of." In addition, Parris testified that when Christopher got angry, he usually screamed at her, but there were a couple of occasions where he threw her clothes around the room.

In July 2018, a few weeks after Parris got her car, Christopher became angry with her when she met a friend for lunch in Orange County without telling him beforehand. Upon learning of her plans, Christopher sent Parris numerous text messages scolding and berating her for going to lunch. Among other statements containing profanity, he accused her of wanting to "show[ ] off [her] car" instead of helping him address a legal matter he was attending to, told Parris that she was "so f[*]cking immature[,]" and stated he would "never be able to {trust} [her] judgment[.]" Parris told him she was driving home in tears and was available to help. She also apologized to him profusely, stated she felt terrible for making him upset, and tried to explain why she thought her lunch plans would not interfere with her ability to assist him. Christopher then told her to "[s]tay out of [his] f[*]cking phone" because she did not "make any f[*]cking sense."

As noted above, in late March 2019, Christopher purchased the Life Insurance Policy. Parris testified that she was minimally involved in the application process for the Life Insurance Policy. She got her blood drawn and met with the insurance agent on one occasion to give him some documents. Christopher provided the agent with all the other information used to fill out the application. Parris testified that when she received the completed application for signature via DocuSign, she signed it quickly without reviewing it, as "Christopher was rushing [her] to sign

21

it," and "it was easier [for her] to do what Christopher asked of [her] than to deal with his anger and abuse." Based on Christopher's representations, Parris believed the policy's death benefit was $1 million, rather than $4 million. She testified she would not have signed the policy application had she known the death benefit was $4 million.

Parris testified that before the parties got married, Christopher promised he would not have a bachelor party, as he did not want Parris to have a bachelorette party. Shortly before the wedding, however, Christopher's friends threw him a bachelor party. In response, Parris "got really upset[ ] and . . . overdrank."

When Christopher came home from the party, Parris was sick. He screamed at her and told her to sleep on the floor because she did not deserve to sleep on a bed. He also took photographs of her. When Parris tried to sleep in the guest room, Christopher followed her to ensure she slept on the floor, rather than the bed. She eventually slept on the couch.

The next morning, Christopher sent Parris a photograph depicting her standing over a toilet. Subsequently, in multiple messages containing profanity, he criticized and shamed her for getting "sloppy drunk[.]" In doing so, he demeaned her, stating "THAT[']S NOT WHAT LADIES DO, g[i]rls from the gutter yes [*sic*]" and that "women who can't control their drinking belong to a certain class and should stay there." Further, he questioned her judgment and told her she "should be extremely remorseful about [her] stupid[,] childish actions." Christopher also questioned whether he wanted to marry her, stating: "[You] think I want to make a wife out of any girl who did what [you] did last night?" After Parris stated she was embarrassed about what happened

and apologized several times, Christopher stated: "[I] hope this never happens again."

Parris testified that during their wedding, Christopher "blamed [her] for multiple issues." He told Parris that she was not allowed to have any drinks and blamed her for the poor appearance of his daughter's hair. Soon thereafter, Parris asked her friend to accompany her to the restroom, as she "felt like [she] was starting to have a panic attack." After taking a few minutes to breathe, Parris returned to Christopher, who immediately berated her for spending too much time in the restroom. Parris testified that as a result of his behavior, she "felt controlled."

As noted above, soon after the wedding, Parris began an internship at the Bank of America in Charlotte. Christopher testified he made the decision for Parris to pursue that internship over another one she was offered in Malibu. Originally, however, Parris wanted to take the internship in Malibu.

In late June 2019, Parris did not answer a FaceTime call from Christopher because she was on the phone with a friend. The friend was visiting Parris in Charlotte, and Parris was trying to arrange transportation for her. Christopher got mad at Parris for not answering his call. He stated she was "rude[ ]" and "f[*]cking disrespectful" because she "could h[a]v[e] [t]aken a milli[second] to pick up or call [him] right back soon after he FaceTimed [her] but [she] didn't." Although they had planned to go to Las Vegas together on July 4th, Christopher repeatedly told Parris to cancel her flight to Las Vegas because he did not want to see her. He dismissed her attempts to explain her actions as lame, stupid, and incoherent. Christopher insisted Parris's

behavior was inexcusable, and stated he would never tolerate such conduct from a girlfriend, let alone a spouse.

On July 12, 2019, Christopher told Parris to send a text message to the wife of a business associate. In this message, he wanted her to shame and threaten them for failing to repay money owed to Christopher. When Parris questioned whether she should get involved and refused to send a message to his liking, Christopher accused her of being selfish and unsupportive. He told her he was ashamed to call her his wife, that she was an insult to his name, and that she was a disgrace. He also called her "one hell of an idiot[ ] with "[z]ero intelligence" and a "dumb f[*]ck piece of sh[*]t." Further, he told her, "We are done[,]" and that he never wanted to see her again. In addition, he repeatedly stated he would be packing up her things to send them away.

A week later, Parris sent Christopher a message asking whether he was with a woman whom she had asked him not to speak to again, as she saw him let the woman into the house on their home's security camera at 3:00 a.m. Christopher denied the allegations, and the parties argued by text message over the next few days. Throughout the argument, Christopher—again, using substantial profanity—demeaned Parris with classist insults, told her she was not worthy of his time or the money he had spent on her, and accused her of cheating on him.

The argument escalated to the point that, on July 18, 2018, for the first time in their relationship, Parris called Christopher a name, stating he was a "lying, cheating, egotistical, narcissistic, [*]sshole[.]" Christopher responded: "[You] f[*]cking white trash piece of sh[*]t." He then repeatedly cursed at her, called her several other names, and threatened her multiple times. He stated he "will burn [and] donate all that [he] gave [her,]" that

she "will know what an [*]sshole is capable of[,]" and that he "will make [her] hate[ ] [him]" because he will "show her what [*]ssholes do[.]" Parris begged him to stop, and stated she felt scared and sick. That same day, he sent her an e-mail stating: "I will show no remorse and cut through [you] like . . . hot butter through [a] knife[,] [you] have no f[*]cking idea, who the f[*]ck do you think you [are] talking to????"

As noted above, the parties separated on July 27, 2019. At trial, when asked why she did not leave the relationship immediately upon realizing it had become abusive, Parris testified: "I was scared. I was scared to leave. I knew I would lose absolutely everything. [Christopher] kept me in a perpetual state of debt. And I was a grad student, and I didn't know what he was capable of. And it was easier, sometimes, to s[t]ay than it was to leave . . . ."

As discussed above, in August 2019, Christopher flew to Charlotte and entered Parris's apartment without her prior knowledge or consent.

Between August and November 2019, Christopher continued to e-mail Parris. He incessantly and aggressively cursed at her, called her many disrespectful and lewd names, berated her, insulted her, accused her of cheating on him, and referenced how much he had paid for the wedding and her apartment in Charlotte. On several occasions, he offered to pay some of Parris's bills if she complied with certain requests he had made. For example, Christopher told Parris that he would pay off her credit cards if she gave him her login information for her accounts. He also represented that he would pay off her credit cards if she gave him all the text messages between her and her friends in Charlotte.

In the midst of his insults, Christopher also threatened Parris many times. Specifically, the evidence shows he: (1) threatened that he "will sue [her] for money [he] lost as a result of [their] fraudulent union as well as sue for the cost of the wedding[ ]"; (2) stated he would show her "no f[*]cking remorse[ ]" (capitalization omitted) and that he "[h]ope[d] [her] family can come up with some money" because he "will get a judgment against [her] from the civil court that [he] will use against [her] in the future" to recover the money he spent for her rent in Charlotte, the money given to her by his friends as wedding gifts, and the cost of the wedding; (3) told her to "[b]e ready for a tsunami of lawsuits[ ]" because he "will ask for [his] money back [for] . . . the photographer, flowers, wedding dress, [and] ring[ ]"; (4) stated that until she "s[ought] God's forgiveness for the brutal betrayal [she] dished out to [him], [he] will continue to seek a campaign against [her]"; (5) stated that her father "will bear the brunt of [Christopher's] wrath in his lifetime"; (6) told her she "will know the meaning of suffering[ ]" (capitalization omitted); (7) told Parris that she "need[ed] to be hit hard with a defamation [suit]" and that she "w[ould] find out soon enough if [she was] not careful how [he] dispatch[es] [his] enemies in court[,]" as he "live[s] for a good court fight"; (8) stated that unless she cleared up her alleged lies to him, Parris "will put [her]self in unimaginable financial strain" because he "will cut off [her] car payment[s] [and] car insurance[ ]"; and (9) advised Parris not to "let [him] ruin her" because he "w[ill] put [her] in a financial crisis like [she has] never seen [before], one that will take [her] [d]ecades to clean up[.]"

As noted above, in November 2019, Parris applied for a DVRO and received a TRO in her favor. The next month,

26

Christopher sued Parris's father for attempted civil extortion, intentional infliction of emotional distress, and negligent infliction of emotional distress.

In June 2020, Christopher sent identical letters to Bank of America's Human Resources Department and three of its Human Resources executives. The letters identified Parris by her full name and her birthdate. Christopher told the recipients to conduct a proper background check on Parris before hiring her, as "she has her moral compass upside down, [and is] not the kind of employee you want anywhere near your organization." (Capitalization omitted.) Christopher attached his April 2020 TRO against Parris to the letter, claiming he got the TRO because Parris was harassing him online and stalking him and his current girlfriend on social media. He also related he was in the process of having their two-month marriage annulled. Christopher further stated Parris "has a criminal record from a 2016 felony DUI arrest in San Clemente, California." (Capitalization omitted.) He concluded by asking the recipients to "vet [Parris] properly as she would add zero value to [their] organization." (Capitalization omitted.)

Parris did not find out about the letters until they were obtained in discovery during the underlying proceedings. She grew concerned about what else "he [was] doing behind [her] back that [she was] unaware of . . . ." On appeal, Christopher does not dispute that he violated the November 2019 TRO by sending the letters.

In sum, substantial evidence supports the conclusion that, during their relationship, Christopher used a combination of financial and emotional abuse to overcome Parris's will and subdue her into doing what he wanted without question. Further,

substantial evidence supports the conclusion that after the parties separated, Christopher continued his campaign of emotional abuse, and repeatedly threatened to ruin Parris and her family. He acted on his threats by suing her father and sending unsolicited letters designed to sabotage her career. By way of his actions, Christopher intimidated Parris and caused her significant distress. The record therefore contains substantial evidence to support a finding Christopher engaged in "conduct that, based on the totality of the circumstances, destroy[ed] [Parris's] . . . mental [and] emotional calm." (§ 6320, subd. (c).) It also contains substantial evidence to support a finding that Parris was the victim of "coercive control[,]" as Christopher engaged in "a pattern of behavior that in purpose [and/or] effect unreasonably interfere[d] with [her] free will and personal liberty." (*Ibid.*) Under these circumstances, we conclude the trial court did not abuse its discretion by finding Christopher "disturb[ed] the peace of the other party" (*ibid.*) and issuing a DVRO in Parris's favor.

### C. The trial court did not abuse its discretion by ordering Christopher to change the beneficiary on the Life Insurance Policy.

#### 1. Relevant Background

Immediately after finding sufficient grounds to issue a DVRO in Parris's favor, the trial court addressed her request for an order requiring Christopher to cancel the Life Insurance Policy or change the beneficiary to a charity of her choosing. The court began its analysis by noting the statutes governing its authority to issue certain types of orders under the DVPA. Specifically, the trial court identified: (1) section 6322, which

28

permits it to "issue an ex parte order enjoining a party from specified behavior that the court determines is necessary to effectuate orders under Section 6320 or 6321[ ]" (§ 6322); (2) section 6320, which authorizes the issuance of a DVRO enjoining conduct that "disturb[s] the peace of the other party[ ]" (§ 6320, subd. (a)); (3) section 6340, which allows the court to "issue any of the orders [it is authorized to enter ex parte] after notice and a hearing[ ]" (§ 6340, subd. (a)(1)); (4) section 6324, which allows the court to "issue any ex parte order determining the temporary use, possession, and control of real or personal property of the parties . . . during the period the [DVRO] is in effect[ ]" (§ 6324); and (5) section 6360, which permits "[a] judgment entered in a proceeding for dissolution of marriage . . . [to] include a protective order as defined in Section 6218[ ]" (§ 6360).

The trial court then noted that although the Life Insurance Policy was "an investment vehicle[,]" the asset was also "very personal" in nature. Considering the Life Insurance Policy's $4 million death benefit, as well as the nature and duration of the parties' relationship, the court found Christopher's maintenance of the Life Insurance Policy was an "ongoing disturbance of [Parris's] peace."

Subsequently, the court acknowledged it did not believe it could order Christopher to cancel the Life Insurance Policy because the asset was his separate property. Instead, the trial court: (1) prohibited Christopher from cashing, borrowing against, canceling, transferring, or disposing of the Life Insurance Policy while the DVRO was in place; (2) ordered him to change the beneficiary of the Life Insurance Policy from himself to a charity selected by Parris; and (3) prohibited Christopher

29

from making future changes to the beneficiary of the Life Insurance Policy for the duration of the DVRO.

### 2.     Analysis

Christopher argues the trial court erred by finding his maintenance of the Life Insurance Policy was a form of abuse under the DVPA, and by ordering him to change the beneficiary of the Life Insurance Policy to a charity of Parris's choosing. We address his contentions of error in turn below.

With respect to his first point, Christopher asserts he is "aware of no authority holding that the ongoing passive existence of separate property—legal itself, with no showing of imminent risk arising from that existence—is a form of domestic violence . . . ." This argument is unpersuasive because it does nothing more than point out the novelty of the issue presented in this case (i.e., whether, on the facts in this case, the trial court erred by finding Christopher's maintenance of the Life Insurance Policy disturbed Parris's peace). Christopher's observation regarding the existing case law does not affirmatively demonstrate the trial court erred in making the challenged finding. (See *Rayii v. Gatcia* (2013) 218 Cal.App.4th 1402, 1408 ["An appealed judgment is presumed correct, and the appellant must affirmatively demonstrate error"].)

Christopher also contends the trial court's finding is not supported by sufficient evidence because "there is no substantial evidence in the record that Christopher would intentionally harm Parris." Again, we are not convinced by his argument.

As discussed above, the trial court found Christopher's maintenance of the Life Insurance Policy disturbed Parris's peace. The question, then, is whether this finding is supported by substantial evidence. Bearing in mind that "[w]hat disturbs the

30

peace of a person depends on each case" (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981), we conclude the court's finding is adequately supported by the record. As discussed above, the evidence shows that, throughout their relationship, Christopher emotionally abused Parris, using verbal aggression and intimidation to exert power and control over her. She asked the police to accompany her when she moved out of his home. Then, soon after she moved out, he flew to Charlotte and let himself into her apartment without her knowledge or consent. Following their separation, Christopher flooded Parris with threats, in which he expressed a desire to recoup the substantial sums of money he had spent on her, and promised to bring her and her family to financial ruin. He then went to great lengths to follow through with his threats, going so far as to sue Parris's father and violate her TRO against him by sending her employer unsolicited letters to sabotage her career.

On this record, the trial court could reasonably find Parris was afraid of Christopher. It could also find Parris's discovery of the Life Insurance Policy's $4 million death benefit increased her fear because she learned Christopher had a significant financial incentive to kill her, and that she feared for her safety as a result. Indeed, at trial, Parris testified she had a "true concern that [Christopher] would kill [her]", which led her to "fle[e] to an exclusive area in Hawaii [ ] to get away from him" and prevented her from sleeping at night. She also testified: "[I]f he can send letters to the H.R. executives for no reason at all, except to destroy my career and ruin my life, then what would he do for $4 million?" Given the particular facts in this case, we discern no error in the trial court's finding that Christopher's continued status as beneficiary of the Life Insurance Policy disturbed

31

Parris's peace (§ 6320, subds. (a) & (c)) and therefore was a form of abuse. (§ 6203, subd. (a)(4).)[4]

With respect to his second point of error, Christopher contends the trial court lacked the authority to order him to change the beneficiary of the Life Insurance Policy. In support of this position, he relies principally on three cases: *In re Marriage of Bratton* (1994) 28 Cal.App.4th 791 (*Bratton*), *In re Marriage of Braud* (1996) 45 Cal.App.4th 797 (*Braud*), and *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725 (*Rossin*). As discussed below, none of these cases assist Christopher in demonstrating reversible error.

In *Bratton*, the appellant challenged an order entered in the parties' marital dissolution proceeding directing her to terminate the whole life insurance policy she owned on her ex-husband's life. (*Bratton*, *supra*, 28 Cal.App.4th at pp. 792-793.) The appellate court reversed, holding the ex-husband lacked standing to challenge the legality or enforceability of the appellant's insurance policy on his life. (*Id.* at pp. 794-795.) In *Braud*, the appellate court addressed whether the trial court had jurisdiction to enter the deferred sale of the family home,[5] among

---

4       Having arrived at this conclusion, we need not address Christopher's apparent contention that if the trial court improperly found his maintenance of the Life Insurance Policy was an act of abuse under the DVPA, it also erred by concluding section 6322 authorized it to order him to change the beneficiary of the Life Insurance Policy.

5       "Under a statutory scheme adopted in 1988, family law courts are authorized to issue an order deferring sale of the family home if the court determines that it is 'economically feasible' to maintain the physical condition of the home and required house payments during the deferral period, and that

many other issues arising out of the parties' marital dissolution action. (*Braud, supra*, 45 Cal.App.4th at pp. 804-805.) In so doing, it acknowledged the family court's limited authority over separate property in martial dissolution actions, stating: "'The court may characterize disputed assets and liabilities as being separate or community, may confirm separate property to the owner spouse and, to the extent permitted by statute, may order reimbursement from the community to a party's separate estate or to the community from a party's separate estate. . . . But unless the parties otherwise agree, the court's jurisdiction over separate property extends no further . . . .'" (*Id.* at p. 810, italics omitted.) Lastly, in *Rossin*, another marital dissolution case, the appellate court considered whether the appellant's disability benefits should be characterized as community or separate property. (*Rossin, supra*, 172 Cal.App.4th at p. 730.) It held the disability benefits were separate property because the appellant acquired the right to the benefits before marriage and paid for the disability policy using separate property funds. (*Id.* at pp. 730, 736, 738.)

None of the cases arose under the DVPA. Nor did any of them consider whether a trial court may order a party to change

---

'the order is necessary in order to minimize the adverse impact of dissolution of marriage or legal separation of the parties on the child.' [Citations.] Such an order 'temporarily delays the sale and awards the temporary exclusive use and possession of the family home to a custodial parent of a minor child or child for whom supported is authorized . . . , whether or not the custodial parent has sole or joint custody, in order to minimize the adverse impact of dissolution of marriage or legal separation of the parties on the welfare of the child.'" (*Braud, supra*, 45 Cal.App.4th at pp. 808-809.)

the beneficiary of an insurance policy he or she owns on his or her ex-spouse's life after finding the former's maintenance of the policy constitutes abuse under the DVPA. We, therefore, reject as unsupported Christopher's contention that the trial court erred by ordering him to change the beneficiary on the Life Insurance Policy from himself to a charity of Parris's choosing.[6]

In addition, we conclude the trial court's order fell within the bounds of its broad authority under the DVPA to issue "a panoply of remedial orders" (*Rivera v. Hilliard* (2023) 89 Cal.App.5th 964, 980 (*Rivera*)) to "prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220; see also § 6320 et seq. [authorizing issuance of a variety of ex parte orders]; § 6340 et seq. [authorizing issuance of additional orders after noticed hearing].) "The Legislature has . . . expressed an intent to entrust the courts with some latitude in applying these remedies." (*Rivera*, *supra*, at p. 981.) Specifically, in enacting the DVPA's predecessor statute, the 1979 Domestic Violence Restraining Act, the Legislature "recogni[zed] that '[i]t is virtually impossible for a statute to anticipate every circumstance or need of the persons whom it may be intended to protect. Therefore, courts must be entrusted with authority to issue necessary orders suited to

---

6      We likewise reject as unsupported Christopher's argument that the portions of the DVRO relating to the Life Insurance Policy must be reversed because they "substantially altered his ownership of the policy[ ]" and therefore were "effectively close" to requiring him to cancel the Life Insurance Policy. We express no opinion on the trial court's authority to order the policy's cancellation because that issue is not before us.

individual circumstances, with adequate assurances that both sides of the dispute will have an opportunity to be heard before the court.'" (*Nadkarni*, *supra*, 173 Cal.App.4th at p. 1498.)

Here, the trial court properly exercised its authority under sections 6320, 6322,[7] and 6340 to issue an order protecting Parris from further abuse by Christopher. Taken together, these statutes authorized the trial court to issue the following orders after notice and a hearing (§ 6340, subd. (a)(1)): (1) an order "enjoining a party from . . . disturbing the peace of the other party[ ]" (§ 6320, subd. (a)); and (2) an order "enjoining a party from specified behavior that the court determines is necessary to effectuate orders under Section 6320 or 6321[ ]" (§ 6322). By directing Christopher to change the beneficiary on the Life Insurance Policy from himself to a charity of Parris's choosing, the trial court restricted him from maintaining an insurance policy on Parris's life on terms giving him a significant financial incentive to kill Parris. In so doing, the court appropriately fashioned a remedial order tailored to Parris's needs based on the facts of this case, and enjoined Christopher from engaging in the specific conduct that it had found to constitute an ongoing disturbance of Parris's peace. (See §§ 6320, subd. (a), 6322, & 6340, subd (a)(1); see also *Nadkarni*, *supra*, 173 Cal.App.4th at p. 1498 [noting that, as originally enacted, the DVPA reflected the Legislature's recognition that "'courts must be entrusted with authority to issue necessary orders suited to individual circumstances[ ]'"].)

---

7      In his reply brief, Christopher acknowledges "section 6322 might enable the court to order a change of beneficiary if the maintenance of the policy is found to constitute abuse under the [DVPA] . . . ."

In sum, for the reasons discussed above, we conclude Christopher has not demonstrated the trial court erred by finding his maintenance of the Life Insurance Policy disturbed Parris's peace, and therefore was a form of abuse under the DVPA. Nor has he shown the trial court erred by ordering him to change the beneficiary on the Life Insurance Policy.

### D. Reversal is not required based on the trial court's denial of Christopher's requests for a statement of decision.

#### 1. Relevant Background

On May 24, 2021, in the middle of trial, Christopher filed a request for statement of decision on all issues relating to the Life Insurance Policy. He filed another request for statement of decision on June 14, 2021, which pertained to other aspects of the DVRO entered against him.

In June 2021, the trial court issued written orders denying Christopher's requests. The court ruled: (1) the request filed on June 14, 2021 was untimely because the decision announced on June 4, 2021 was a final, rather than tentative, decision; and (2) the request filed on May 24, 2021, was improper because, rather than seeking the factual and legal basis for the DVRO, it improperly asked the trial court to respond to 15 interrogatory-style questions.

#### 2. Analysis

Christopher argues the trial court erred by denying his requests for a statement of decision because both were timely. For the reasons discussed below, even assuming, *arguendo*, his

requests were timely, we conclude he has not shown reversal is required based on the asserted error.

First, Christopher's requests were improper. "Code of Civil Procedure section 632 authorizes [a] party to request a statement of decision and thereby obtain the legal and factual basis for the trial court's decision." (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 525 (*Casa Blanca*).) The requests filed by Christopher, however, did not merely ask the trial court to explain the factual and legal basis for the DVRO. Instead, his first request asked the trial court to respond to 15 different statements relating to the Life Insurance Policy. His second request asked the court to respond to 66 separate questions, many of which contain additional follow-up questions, relating to a sprawling number of issues and topics. Accordingly, Christopher's requests inappropriately "s[ought] an inquisition, a rehearing of the evidence." (*Casa Blanca*, *supra*, at p. 525.) We therefore discern no error in the trial court's decision to deny these requests. (See *id.* [holding as improper a request for a statement of decision that made 16 demands, each with several sub-parts, which would have required the trial court to answer over 75 questions]; see also *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 981-982 [request for statement of decision comprising a "laundry list of 52 demands" was improper].)

Second, Christopher has not demonstrated he was prejudiced by the trial court's failure to issue a written statement of decision. "[A] trial court's error in failing to issue a requested statement of decision is not reversible per se, but is subject to harmless error review." (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.) "'[T]he burden is on the appellant in every case to show

37

that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice.' [Citation.] Injury is not presumed from error, but injury must appear affirmatively upon the court's examination of the entire record. 'But our duty to examine the entire cause arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. . . . [T]he appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice.'" (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.) Nowhere in his briefs does Christopher clearly explain how he was prejudiced by the denial of his requests for a statement of decision. We therefore conclude the asserted error is harmless. (See *Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77 ["Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there"].)

### E.    We need not address Christopher's arguments regarding the attorneys' fees award.

Christopher's contentions for full or partial reversal of the order awarding attorneys' fees to Parris are conditioned on full or partial reversal of the DVRO against him. Having rejected his challenges to the DVRO, and thereby concluding it should be affirmed in its entirety, we need not address his arguments relating to Parris's attorneys' fees award.

38

## DISPOSITION

The DVRO is affirmed. In addition, the order directing Christopher to pay Parris's attorneys' fees is affirmed. Parris shall recover her costs on appeal.

## CERTIFIED FOR PUBLICATION

CURREY, P. J.

We concur:

MORI, J.

ZUKIN, J.